**UNITED STATES of America, Appellee,**

v.

**Farhad BAKHTIAR and Anthony McDonald, Defendants–Appellants.**

**Nos. 1239, 1240, Dockets 92–1666, 92–1673.**

United States Court of Appeals, Second Circuit.

Argued March 31, 1993.

Decided May 17, 1993.

---

Howard R. Hawkins, Jr., New York City (Curtis L. Sykes, Richard A. McGuirk, Cadwalader, Wickersham & Taft, of counsel), for defendant-appellant Farhad Bakhtiar.

James T. Moriarty, New York City, for defendant-appellant Anthony McDonald.

Steven M. Witzel, Asst. U.S. Atty., New York City (Roger S. Hayes, U.S. Atty., Andrew C. McCarthy, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, PIERCE and PRATT, Circuit Judges.

OAKES, Circuit Judge:

Farhad Bakhtiar and Anthony McDonald appeal from their convictions on charges of conspiracy, bank fraud, wire fraud, money laundering, illegal monetary transactions using the proceeds of criminal activity, and possession and transportation of forged and counterfeit checks, violations of, respectively, 18 U.S.C. §§ 371, 1344, 1343, 1956(a)(2)(B), 1957, 513(a), and 2314 (1988 and Supp. III 1991). The convictions were entered following a 13–day jury trial in the United States District Court for the Southern District of New York, Louis L. Stanton, *Judge*. Bakhtiar and McDonald argue that the government's loss of certain pieces of evidence deprived them of a fair trial; that the introduction of duplicates of the counterfeit checks violated the best evidence rule and deprived them of a fair trial; that the jury did not receive adequate instructions on conspiracy or on Bakhtiar's good faith defense; and that the evidence was insufficient to support a conviction. In addition, Bakhtiar argues that his trial should have been severed from McDonald's because taped statements by McDonald should not have been admitted against him. McDonald also appeals the district court's refusal to grant a 2–level reduction in his sentence on the ground that he was a minor participant in the scheme (Bakhtiar was granted such a reduction). We affirm.

## I. FACTUAL BACKGROUND

Bakhtiar, an Iranian citizen very well-connected to the pre-Revolutionary govern-

ment,[1] was the principal of two Geneva, Switzerland businesses, a brokerage house called First Securities, S.A. ("First Securities") and a consulting firm called A & B Investment Advisory ("A & B"). He also served as the managing director of a large Italian bank in Geneva. McDonald was the first Executive Director of the Commodities Futures Trading Commission ("CFTC").

The charges stemmed from the defendants' involvement in separate schemes to defraud two banks. In the first, the Bank of New York ("BNY") scheme, Bakhtiar and McDonald, together with the conceded masterminds of both schemes, Joseph Conetta, Joseph Lipson and Joseph Ruffalo, defrauded the BNY of $232,831.52 in unclaimed interest payments due to escheat to the State of New York. According to the government's brief, BNY annually collects approximately $36 billion dollars in interest and dividends for its custodial accounts. Because of trading inconsistencies and allocation problems, certain of these funds are not claimed. The bank deposits these funds into a separate account. Funds remaining unclaimed for three years (approximately $20 million per year) by statute escheat to the State of New York.

In the summer of 1989, Lipson, a commodities trader, was approached by Conetta and Ruffalo with a scheme to obtain some of these funds. Ruffalo had a contact at BNY with access to the accounts, but the conspirators needed to find an entity, such as a bank or a brokerage company, to make the fraudulent claim on the escheated funds. For help in finding such an entity, Lipson contacted McDonald, whom he knew from McDonald's days at the CFTC, and McDonald in turn contacted Bakhtiar. Bakhtiar advised McDonald and Lipson to open a fictitious account at First Securities, and provided information, including a Credit Suisse affiliation, enabling the conspirators to route a claim for the funds through Bakhtiar's consulting firm, A & B. The phony First Securities account was in the name of "JJJ Trading" (which allegedly stands for the "Three Joes"—Conetta, Lipson, and Ruffalo). Using the infor-

mation provided by Bakhtiar, Ruffalo and Conetta completed a claim form, dated February 7, 1990, requesting $232,831.52 in unclaimed interest on behalf of A & B. Ruffalo gave Conetta a BNY check for the funds, payable to A & B, and mailed the check to Bakhtiar's attention at A & B. Bakhtiar endorsed the check three days later. Bakhtiar's sister-in-law, Pouran Sheikhan, then flew from Switzerland to New York to deliver the New York conspirators' share of the cash, which was variously said to amount to $160,000, $170,000, or $200,000 (she declared $209,900 in entering the country). Lipson and Conetta met Sheikhan at the airport, and McDonald used his American Express card to guarantee her hotel reservation in New York.

Ruffalo's contact at BNY was discharged or laid off shortly after the success of the first scam. However, Ruffalo had a new contact with access to checks at a financial institution and to a printer capable of counterfeiting checks. He called Conetta and suggested that they once again contact Lipson, McDonald and Bakhtiar to set up a plan. This led to the second scheme, to defraud the Security Pacific National Bank ("Security Pacific"), involving counterfeit checks drawn on Shearson Lehman Hutton ("Shearson") accounts at Security Pacific's La Jolla, California branch. The conspirators copied unused check numbers from the Shearson account and had counterfeit copies of these checks drawn up. The counterfeited checks were made payable to various fictitious companies in the Middle East, including "World Curtain Corporation," "Crown Point" and "Gulf Flower." Conetta and Ruffalo mailed the first two checks, for $474,000 and $437,000, both payable to World Curtain, to Bakhtiar at First Securities; Bakhtiar had the checks deposited at the Banque de l'Orient et d'Outre Mer ("Banorabe") in Dubai, United Arab Emirates ("U.A.E."). The total from these two checks of $911,000 was credited to an account at Banorabe Dubai in the name of Mohamad Afif Diab; $711,000 was wire transferred from that account to Banorabe Geneva for the benefit of Bakhtiar's friend,

---

1. Bakhtiar's cousin, Shaptour Bakhtiar, was the last prime minister of Iran before the Islamic Revolution. Another relative was married to the Shah.

Ahmad Ataer Al Agaby, and $140,000 to Banorabe London for the benefit of one Osama Kamaluddin Rukn. Four additional checks drawn on Shearson's Security Pacific accounts, made out to Crown Point and Gulf Flower and totalling $1,579,000, were found in the possession of Al Agaby when he was arrested in Egypt for the fraud against the Dubai bank. The Middle Eastern conspirators were tried in Dubai.[2] Bakhtiar once again enlisted Sheikhan to fly $300,000 in cash to New York, and he also transferred $250,000 to the New York conspirators by wire. It is claimed that he kept a larger portion of the proceeds in the second scheme because of the greater risk involved.

All told, it appears that McDonald gained $20,000 from the BNY scheme but only $1,000 from the Security Pacific scheme. McDonald attributes this small take in the second scheme to his having a minor role; the government claims that the conspirators were caught before McDonald's full share was distributed. Though no explicit finding on this subject was made by the district court, judging by the amounts returned to the United States, it can be inferred that Bakhtiar gained between $20,000 and $40,000 from the first fraud, and roughly $160,000 from the second.

Some seven months later, Conetta, Lipson and Ruffalo suggested a new scheme to defraud Drexel, Burnham, Lambert, Inc. ("Drexel") of unclaimed interest payments. At roughly the same time that the Drexel scheme was being developed, Lipson, Conetta, and Ruffalo were arrested for their part in an unrelated scheme to steal United States Treasury bonds. All three pleaded guilty to charges related to that scheme, and the BNY and Security Pacific schemes were considered as relevant conduct in their sentencing hearings. None of the three, however, was actually charged with any crime associated with the BNY or Security Pacific frauds. Rather, in exchange for leniency, Lipson and Conetta served as the government's key witnesses against Bakhtiar and McDonald.

As part of Lipson's cooperation agreement, he also wore a microphone in a number of meetings with McDonald related to the Drexel scheme and other matters. As many as 75 tapes were made of Lipson and others involved in these schemes. However, the Secret Service, which was in charge of the investigation, evidently lost its tapes of five of these conversations. As a result of the loss of this evidence, the government dropped its charges against Bakhtiar and McDonald related to the Drexel scheme. However, Bakhtiar and McDonald claim that the still available brief Secret Service summaries of these tapes indicate that they would have been useful as impeachment material in their trials for the crimes associated with the BNY and Security Pacific frauds as well, in that the tapes allegedly demonstrate their reluctance to engage in criminal activity. They claim that the Secret Service has weak chain-of-evidence procedures that contributed to the loss of evidence. Furthermore, they note that weak procedures provide the potential for selective destruction of unfavorable evidence, and argue that the Secret Service was so negligent in its routine handling of these tapes that the losses should be deemed willful, or in "bad faith," in the terms of the case law. However, the district court concluded that there was no reason to believe the defendants' claims that the missing evidence would have been exculpatory.

This case has twice before reached this court. On the first occasion, the government appealed Judge Stanton's suppression of McDonald's confession as involuntary, following

---

**2.** The status of the proceedings in Dubai is not clear from our record. According to a letter brief the government sent to the district court, it appears that Al Agaby, Diab, and Rukn were acquitted at trial; that the acquittal was reversed on appeal; and that at the time of Bakhtiar's and McDonald's trial, this decision had been appealed and further hearings were expected.

Because the proceedings in Dubai began before any conspirators had been identified in this country, the government turned over the original World Curtain checks to Dubai authorities for use in their case. The checks made out to the other two companies were seized by Egyptian authorities and sent directly to Dubai. The authorities in Dubai made copies of all the checks for use in the trial of McDonald and Bakhtiar, but, despite requests from the State Department, the Federal Bureau of Investigation, and Security Pacific's representative in Dubai, the originals could not be obtained since the Dubai proceedings had not been completed.

a hearing in which it appeared that the confession was obtained by promising McDonald that he could return home to his very ill parents much more quickly if he cooperated. The Court of Appeals remanded for further findings, *United States v. Bakhtiar*, 962 F.2d 2 (2d Cir.1992) (table), and on remand Judge Stanton again ruled that the confession should be suppressed. After a 13–day trial featuring the testimony of Lipson and Conetta, a jury found both Bakhtiar and McDonald guilty of all charges. Following trial, Judge Stanton released the defendants on bail pending sentencing. The government appealed the bail decision with respect to Bakhtiar, who continued to reside abroad, and this court affirmed. *United States v. Bakhtiar–Bakhtiari*, No. 92–1237 (2d Cir. May 5, 1992). Judge Stanton sentenced both Bakhtiar and McDonald to the minimum possible terms under the guidelines.[3] Both defendants were released on bail pending the outcome of this appeal.

## II. DISCUSSION

### 1. *Missing evidence as Brady or 18 U.S.C. § 3500 violation.*

■ Bakhtiar and McDonald allege that the government's loss of a number of items violated the requirement of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, that the prosecution provide the defense with material exculpatory information.[4] While we agree that the government was sloppy in its handling of this evidence, it appears that the missing material would have been of little or no use to the defense. Consequently, the loss did not deprive either defendant of a fair trial.

The claims arise from:

(1) The disappearance of five tapes of six conversations between Lipson and Charles Chitty, a cooperating informant, allegedly due to the Secret Service's inadequate chain-of-custody procedures. According to the Secret Service logs of these tapes, the first two, on January 3, 1991, concerned the Treasury bond scheme, in which McDonald and Bakhtiar were not involved; the third, on January 8, set up a meeting; and the fourth and fifth, on January 9, concerned the Drexel scheme. The summary of the fourth says, "Lipson want[s] to do entire deal through CI [Chitty]," from which Bakhtiar infers that Lipson did not plan to do the deal with him. The sixth conversation, on January 24, 1991, was not summarized.

(2) The prosecution's failure to inform the defendants that Lipson had made statements indicating that Bakhtiar was not involved in the Drexel scheme (apparently this is a reference to the January 9 conversation in which Lipson said he wanted to do the deal through Chitty; as the defense was provided with a copy of the log, this is essentially a repetition of the claim that the lost tape was not furnished).

(3) The disappearance of a currency transaction form from Sheikhan's second trip, on which Sheikhan told customs officials that she had brought $300,000 in cash into the country to buy real estate; Bakhtiar alleges that this form would have buttressed the claim that the money was in fact brought in for this purpose rather than to pay off the conspirators for their roles in the Security Pacific scheme.

---

**3.** Both defendants had a base offense level of 25 and a criminal history category of I; Bakhtiar received a 2–level reduction for being a minor participant. Bakhtiar received 46 months' imprisonment and 3 years supervised release; McDonald received 57 months' imprisonment and 3 years supervised release. In addition, Bakhtiar was ordered to pay restitution of $184,000, a fine of $223,000, and $650 in assessments. McDonald, who had virtually no assets, was ordered to pay $600 in assessments.

**4.** Both defendants also argue that the failure to provide the tapes violated 18 U.S.C. § 3500 (1988), governing discovery of "statements" of government witnesses. Essentially § 3500 bars

discovery until the witness has testified on direct examination in the case, and limits discovery of such statements to material relating to the subject matter of the testimony; it operates as a limitation on the general discovery rules set forth in Fed.R.Crim.P. 16. Rule 16 requires the prosecution to make available any requested material evidence "within the possession, custody, or control of the government," Fed.R.Crim.P. 16(a)(1)(A) (statements of defendant); 16(a)(1)(B) (defendant's prior record); 16(a)(1)(C) (documents and tangible objects); 16(a)(1)(D) (reports of examinations and tests), subject to the limits imposed by 18 U.S.C. § 3500, Fed.R.Crim.P. 16(a)(2).

(4) The loss of a tape of an April 1, 1991 meeting concerning the Drexel scheme, at which, according to Lipson's trial testimony, McDonald accused another conspirator of being a "cheap crook," or words to that effect, for seeking a bribe from Bakhtiar; and the "concealment" of a Secret Service memo indicating that no tape had been made of this conversation because the tape recorder had malfunctioned. Allegedly this tape would have been useful to impeach Lipson's testimony that Bakhtiar was willing to engage in criminal activity. The secret service log was "concealed" in that, because the government had not initially charged Bakhtiar and McDonald in the Drexel scheme, the government did not at first produce the log in response to questions about what relevant evidence it possessed.

(5) The failure to produce the original Security Pacific counterfeit checks.

(6) The production of only one set of notes of a Feb. 7, 1991 meeting between Conetta and federal agents, following Conetta's arrest, despite Conetta's testimony that more than one agent had taken notes of the meeting (no agent remembers any other agent taking notes and the defense was given the opportunity to question the agents).

(7) A 45–second gap in a tape of a March 29, 1991 conversation between Elison, another conspirator, and Bakhtiar, which the government explained at first as the result of Elison having knocked the plug out of the tape recorder, and later as the result of a failure to turn the tape over promptly. The government introduced only material before the gap.

A. Legal standard.

Bakhtiar and McDonald claim that the missing evidence violated *Brady*'s requirement that the prosecution disclose material evidence. The *Brady* Court held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

> The principle [underlying this rule] . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.

373 U.S. at 87, 83 S.Ct. at 1196–97.

However, although Bakhtiar and McDonald cast this case as one of failure to disclose exculpatory material, like *Brady* and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), it really involves the loss or destruction of evidence. This situation poses problems slightly different from *Brady* and *Bagley*: any error here cannot be cured by ordering a new trial including the missing evidence, and it is more difficult to determine whether the lost evidence was material to the case.

Some of the case law suggests that defendants can be deprived of a fair trial only if the government acted in bad faith. *E.g. Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (negligent destruction of semen samples did not deprive the defendant of a fair trial). *Youngblood*, following *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 2533–34, 81 L.Ed.2d 413 (1984) (failure to preserve drunk drivers' breath samples for retesting) limits bad faith destruction to situations in which the government knew of the exculpatory value of the evidence when it was destroyed. The defendants argue that it is also bad faith for a government agency to provide no reliable system for the preservation of evidence, citing *United States v. Bryant*, 439 F.2d 642 (D.C.Cir.1971). As Judge Skelly Wright argued in *Bryant*, the only way to protect *Brady* material before the defendant requests it is to require the government to safeguard potentially exculpatory evidence. 439 F.2d at 650–53.

*Bryant* may still have validity after *Youngblood*, since the evidence at issue in *Youngblood* was of a sort only "potentially" exculpatory—it had never been tested for determination of its exculpatory or inculpatory value. By contrast, the evidence we have here did not need to be tested to determine its value; it is possible in this case that government agents recognized some exculpatory value in the tapes and destroyed them or that government agents made use of the

lost evidence before it was lost. However, we need not reach that issue. Even if Bakhtiar and McDonald could establish that the Secret Service procedures were inherently deficient under the *Bryant* standard, they have failed to show something far more important: that any of these losses prejudiced their defense. *See United States v. Grammatikos*, 633 F.2d 1013 (2d Cir.1980). As the *Grammatikos* court held,

> the appropriateness and extent of sanctions ... depends upon a case-by-case assessment of the government's culpability for the loss, together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof.

633 F.2d at 1019–20. *Accord, United States v. Morgenstern*, 933 F.2d 1108, 1115–16 (2d Cir.1991) (loss of evidence through "unthinking negligence of gross magnitude"—loaning materials to complaining witnesses—did not substantially prejudice defense), *cert. denied*, —— U.S. ——, 112 S.Ct. 1188, 117 L.Ed.2d 430 (1992); *United States v. Maldonado–Rivera*, 922 F.2d 934, 954–55 (2d Cir. 1990) (loss inadvertent and materials available in other forms), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 and *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1026, and *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991); *United States v. Rastelli*, 870 F.2d 822, 833–34 (2d Cir.) (no prejudice; government lost tapes of three conversations through negligence, not bad faith), *cert. denied*, 493 U.S. 982, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989); *see also United States v. Bufalino*, 576 F.2d 446, 449 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978) (where documents destroyed deliberately, government "bear[s] the heavy burden of demonstrating that no prejudice resulted").

None of the missing items meets this standard. None of the missing tapes, for example, dealt with the BNY or the Security Pacific scheme. At best, the missing tapes might have suggested that Bakhtiar was not involved in the Drexel scheme, that he was unwilling to do something allegedly dishonest on one other occasion (refusing to give someone money upfront for a gold trade, which McDonald called, on tape, "Farhad's legitimate deal"), and that this evidence indicated that he was an honest man. Even if the tapes were admissible to prove that Bakhtiar would have behaved honestly when the BNY and Security Pacific schemes were proposed—and even if the material were admissible for this purpose, which the government disputes—it is very hard to see how these arguments would have helped. The jury was presented with ample evidence that Bakhtiar had participated in the schemes and received large sums of money as a result; it would likely have been skeptical about drawing the inference that Bakhtiar's lack of participation in one scheme demonstrated that he was too honest a man to have participated in another. Indeed, the available evidence suggests that the tapes might have been more inculpatory than exculpatory, so that Bakhtiar may have been better off raising these arguments to the jury on the bases of the summaries of the tapes and the suggestion that the loss of the tapes was suspicious.

Nor would the tapes have been very useful as impeachment evidence, even if they said what Bakhtiar and McDonald claim. The alleged impeachment value is to demonstrate that Lipson thought Bakhtiar would not conduct illegal activity; the statements seized upon must be twisted to reach this conclusion, and at best suggest that Bakhtiar was not interested in particular deals because of their high risk. In sum, while the prosecution handled the evidence sloppily, the affected evidence, even assuming the defense characterizes it accurately, was not material to these charges.

While there may be circumstances in which government sanctions for negligent loss of evidence are appropriate, per *Bryant,* this is not that case. Sanctions should be tailored to redress for any resulting harm to the defendant, and perhaps to spur the government to handle things more carefully; they should not bar the government from proceeding against the same defendants on other charges, unless the missing evidence is material to those charges. In this case, the defendants benefited from the prosecution's

loss of evidence when the charges related to the Drexel scheme were dropped.

### 2. Bakhtiar's severance motion.

Bakhtiar also argues that his trial should have been severed from McDonald's because statements were admitted in the joint trial which would not have been admissible against him in a separate trial, and which unduly prejudiced his right to a fair trial. The relevant statements were made in taped conversations between McDonald and Lipson after Bakhtiar's arrest, in which McDonald and Lipson tried to concoct a cover story to explain why Bakhtiar had been sending them so much money. The statements were admitted under the hearsay exception for statements against penal interest, Fed.R.Evid. 804(b)(3). There are two requirements under Rule 804(b)(3) for admissibility of statements against penal interest: that the declarant be unavailable, and that the statement "at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Corroboration is also required if the statement is offered to exculpate the accused, *id.;* here, of course, it was offered by the government.

■ The parties agree on the first point, that McDonald was unavailable as a witness on the ground of privilege. Fed.R.Evid. 804(a)(1); *United States v. Beltempo,* 675 F.2d 472, 479 (2d Cir.), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1982), *citing United States v. Thomas,* 571 F.2d 285 (5th Cir.1978) (codefendant who elects not to take stand is unavailable as witness even without formal claim of privilege). They disagree, however, on the second. Bakhtiar argues that when McDonald made the statement, he had suspicions that Lipson was a government agent, and that McDonald's statements were not reliable because McDonald may have been trying to inculpate Bakhtiar and to minimize his own role.

However, the statements do not appear to be of this sort. While McDonald once checked Lipson for a wire and sought assurances that he was not cooperating, he appears to have satisfied himself before talking. More significantly, the statements incriminate McDonald, as well as Bakhtiar, rather than attempting to shift responsibility from McDonald to Bakhtiar. *Cf. United States v. Katsougrakis,* 715 F.2d 769, 774–75 (2d Cir. 1983) (discussing trustworthiness of statements against penal interest which also implicate another), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

■ Bakhtiar also argues that even if the statements fell within the penal interest exception to the hearsay rule, they do not meet the independent requirements of the Confrontation Clause. Generally speaking, there is no confrontation clause problem if the defendant is unavailable and the statement "bears adequate 'indicia of reliability,'" *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). These indicia of reliability may be found either by determining that the hearsay exception is "firmly rooted,"[5] or by independent evaluation of the surrounding circumstances.

We have previously held that the penal interest exception is firmly rooted. *Katsougrakis,* 715 F.2d at 776. Some recent cases cast some doubt on this conclusion, however, and the Supreme Court has not addressed the question. *See United States v. Flores,* 985 F.2d 770 (5th Cir.1993) (exception for statements against penal interest not firmly rooted); *Olson v. Green,* 668 F.2d 421, 428 (8th Cir.) (custodial statements implicating third party do not fall within firmly rooted exception), *cert. denied,* 456 U.S. 1009, 102 S.Ct. 2303, 73 L.Ed.2d 1305 (1982). *But see United States v. York,* 933 F.2d 1343, 1362–64 (7th Cir.) (exception firmly rooted as to statements not made to limit declarant's exposure), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991); *United States v. Seeley,* 892 F.2d 1, 2 (1st Cir.1989), *citing*

---

**5.** The Supreme Court uses the term "firmly rooted" to describe those hearsay exceptions which "rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of constitutional protec-

tion.'" 448 U.S. at 66, 100 S.Ct. at 2539. The Court has explained that "[t]his reflects the truism that 'hearsay rules and the Confrontation Clause are generally designed to protect similar values.'" *Id.* (footnotes and citations omitted).

*Katsougrakis,* 715 F.2d at 766 (exception "would seem to be 'firmly rooted.'"). The *Flores* Court concluded that the exception for declarations against penal interest is not firmly rooted because it historically has been quite controversial, because it has only recently been added to the Federal Rules of Evidence, and because the Supreme Court has indicated that statements against penal interest which also inculpate a third party are often suspect. *Flores,* 985 F.2d at 777–80.

█ In any event, we need not meet the "firmly rooted" question head on. The statements in this particular instance bore adequate independent indicia of reliability, meeting the "'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause ... drawn from the totality of the circumstances [surrounding] the making of the statement and [rendering] the declarant particularly worthy of belief." *Idaho v. Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 3149, 111 L.Ed.2d 638 (1990). Those indicia of reliability, in this case, as in so many cases of statements against penal interest, are based in the general understanding that people do not ordinarily make statements damaging to themselves unless they are true. Bakhtiar suggests that McDonald's statements were unreliable because he suspected that Lipson was an informer and that his statements were therefore made in an attempt to minimize his own culpability, to shift blame to Bakhtiar, or to curry favor with authorities. Such statements, we agree, do not bear the same indicia of reliability as the usual statement exposing a declarant to unpleasant consequences, such as criminal liability. This is because, in effect, the declarant attempting to shift blame or curry favor no longer believes that at least that portion of the statement which is self-serving is against his penal interest.

However, a review of the transcripts reveals that Bakhtiar's characterization of the conversations between Lipson and McDonald is not apt. The portion of McDonald's statement damaging to Bakhtiar was precisely that portion that was damaging to McDonald—McDonald's effort to come up with a cover story to explain why Bakhtiar had

wired money to Lipson and McDonald. Furthermore, in the words of *York,* where "the circumstances surrounding the portion of a declarant's statement inculpating another are such that the court determines that the inculpatory portion of the statement is just as trustworthy as the portion of the statement directly incriminating the declarant, there is no need to excise or sever the inculpatory portion of the statement." 933 F.2d at 1364. *See also United States v. Stratton,* 779 F.2d 820, 830 (2d Cir.1985) (same), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 and *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986). While at one point on the tapes McDonald tries out, as a story for Lipson and McDonald to use when questioned by authorities, that he and Lipson did not know much about what was going on, that they did not think anything about the deals looked funny, and that they had contacted Bakhtiar for his assistance because he knew a lot about how business was conducted in Europe, this does not appear to be an attempt to convince Lipson of McDonald's innocence. McDonald's comments elsewhere on the tapes demonstrate that he assumes Lipson knows that he knows more. After examining the statements, and the circumstances in which they were made, we conclude that McDonald could not have been attempting to minimize his exposure by including Bakhtiar in his comments, and that the totality of the circumstances surrounding the making of these statements provide particularized guarantees of their trustworthiness.

█ In any case, though, if it was error to admit the statements against Bakhtiar, the error was harmless. There was substantial other testimony connecting Bakhtiar to the frauds, in particular the testimony of Lipson and Conetta. In addition, there was substantial corroborative evidence of Bakhtiar's financial transactions and telephone conversations with the other conspirators.

*3. The missing checks and best evidence rule.*

█ Both Bakhtiar and McDonald argue that the government's failure to produce the original counterfeit Security Pacific checks

deprived them of a fair trial. Federal Rule of Evidence 1003 permits the use of duplicates, such as photocopies, to prove the contents of a writing "unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

The defendants raise no serious questions as to the authenticity of the original, or as to the fairness of admitting the duplicates. The duplicates included clear color and black and white photographs and photocopies of the checks. The first set of copies, made by a Shearson employee immediately after the fraud was discovered, was authenticated at trial; the most recent was accompanied by a certificate of authenticity provided by officials at Banorabe Dubai. The defendants do not challenge the fairness of introducing the duplicates as a means of establishing the contents of the writing—the concern of the best evidence rule. Rather, Bakhtiar and McDonald argue that they needed to conduct fingerprint analysis of the checks to demonstrate that they had not handled the checks. They further argue that examination of the originals would have enabled them to rebut the prosecution's claims as to the methods by which the originals were fabricated. However, these arguments were raised for the first time only two weeks before the final trial date. In a hearing before Judge Stanton, the government argued that it ordinarily takes the FBI months to conduct such analysis, and that the late request thus demonstrated that the defendants were not serious about needing fingerprint analysis or other expert analysis of the checks, but simply looking for a way out of the trial. Judge Stanton concluded that the copies were adequate and rejected the claim that the use of duplicates would be unfair to the defense. We agree.

### 4. McDonald's request for reduction in sentence for minor participant status.

 McDonald argues that he should have been granted a two-level reduction for being a minor participant in the frauds. He claims that, contrary to the government's assertions, he was not a middleman, but simply arranged for the first contact between Lipson and Bakhtiar and thereafter was irrelevant. He claims that he received little money for his part in the Security Pacific scheme, and that this demonstrated the insignificance of his position. However, the government presented a range of evidence indicating that, while the conspirators might have been capable of proceeding without McDonald's help, he continued to make phone calls on behalf of the conspiracy. They suggest that he received little money for his role in the second scheme only because the scheme was interrupted before all of the money could be collected. The taped conversations include discussions between Lipson and McDonald in which McDonald suggests ways to cover up the conspiracy. In short, the disagreement is entirely factual. Judge Stanton's review of the facts was careful and his handling of the case a model of fairness; we do not think his resolution of this factual dispute was clearly erroneous. *See United States v. Davis,* 967 F.2d 84, 88–89 (2d Cir.) (clearly erroneous standard), *cert. denied,* —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992).

### 5. Other issues.

We have considered the defendants' other arguments, and found them to be without merit. In particular, we have closely examined the jury instructions challenged by the defendants, and conclude that Judge Stanton's careful instructions amply informed the jury of the elements necessary to a finding of guilt, and that the objections may have been waived by the defense's failure to renew its objections to the instructions at the charging conference or after the charge was given.

### III. CONCLUSION

Accordingly, we affirm the judgments of the district court.