**UNITED STATES of America, Appellee,**

v.

**Robert SASSO, Jr., and Anthony Armienti, Defendants–Appellants.**

**Nos. 782, 994, Dockets 94–1345, 94–1346.**

United States Court of Appeals, Second Circuit.

Argued Feb. 6, 1995.

Decided July 5, 1995.

---

Ellen M. Corcella, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the E.D. of N.Y., David C. James, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee.

David Breitbart, New York City (Richard Rubenstein, New York City, on the brief), for defendant-appellant Robert Sasso, Jr.

Vivian Shevitz, Mt. Kisko, NY (Jane Simkin Smith, Mt. Kisko, NY, on the brief), for defendant-appellant Anthony Armienti.

Before: KEARSE, CARDAMONE, and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Robert Sasso, Jr., and Anthony Armienti appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Sterling Johnson, Jr., *Judge,* convicting them of conspiring to deal in firearms and to possess and receive firearms with obliterated serial numbers, in violation of 18 U.S.C. § 371 (1988), and of dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A) (1988); convicting Sasso of possessing defaced firearms, in violation of 18 U.S.C. § 922(k) (1988 & Supp. II 1990); and convicting Armienti, a previously convicted felon, of possessing a firearm, in violation of 18 U.S.C. § 922(g)(1) (1988). Sasso and Armienti were sentenced principally to 51 and 115 months' imprisonment, respectively, to be followed by three-year terms of supervised release, and each was fined $50,000. On appeal, defendants contend, *inter alia,* that the district court made erroneous evidentiary and discovery rulings, and that it erred in denying their motion for a new trial on the ground that one of the government's key witnesses committed perjury. In addition, Sasso contends that his rights under the Confrontation Clause of the Sixth Amendment were violated by the admission at trial of hearsay statements of Armienti implicating Sasso in the offenses; Armienti challenges the calculation of his offense level under the federal Sentencing Guidelines ("Guidelines") and the imposition of a fine. For the reasons below, we affirm.

## I. BACKGROUND

The present prosecution arises out of an investigation by a task force of New York City Police Department officers and Bureau of Alcohol, Tobacco, and Firearms ("BATF") agents into unlawful weapons trafficking. The evidence at trial included testimony from coconspirator Richard C. Van Allen, who began cooperating with the government following his arrest in December 1992 and recorded certain conversations thereafter; testimony from Armienti's former girlfriend; and telephone records. Taken in the light most favorable to the government, the evidence showed that Van Allen unlawfully supplied Sasso with guns from 1989 to 1992 and that Armienti was involved from 1990 to 1992.

### A. The Evidence as to the Events

Van Allen, a sometime truck driver who held a BATF license to sell firearms from his home in Long Island, New York, met Sasso in 1989 when both worked in construction in New York City. Sasso asked whether Van Allen could obtain guns for Sasso. Thereafter, Sasso began buying from Van Allen 5–15 small-caliber handguns a week.

In 1990, Sasso introduced Armienti to Van Allen, arranging for Armienti to deliver money or pick up weapons ordered by Sasso. Armienti performed these duties from time to time from mid–1990 until mid–1992. During that period, Sasso also introduced Frank Angelo to Van Allen, stating that Angelo wanted to come in "almost like a partner ... only he was going to be doing all the leg work," delivering the money and picking up the firearms. (Trial Transcript ("Tr.") at 423.) In a January 1993 tape-recorded conversation, Angelo confirmed to Van Allen that Sasso placed the orders and received a share of the profits, but had Angelo do the leg work.

Over time, the size and frequency of the orders Van Allen received from Sasso in-

creased. Van Allen testified that during the period in question, he purchased and sold nearly 3,000 guns, some 2,000 of them in 1992. He said that "99 and a half percent" of his firearms sales in 1992 were made to Sasso (Tr. at 430; *see also id.* at 588 ("99.9 percent" overall); *id.* at 589 ("99.99 percent" overall)), either directly or through Armienti and Angelo. Van Allen also testified that after he obtained guns, he, Sasso, and Angelo removed their serial numbers, using a variety of tools.

Kristine Kramer, Armienti's girlfriend for most of the period from August 1991 to June 1992, testified to her observations and her conversations with Armienti during that time. Kramer, a truck driver in her mid-40's, was a member of the Teamsters Union and was thereby acquainted with Sasso and with Sasso's father, who was president of Teamsters Local 282, and she knew Van Allen by sight.

In late 1991, Kramer invited Armienti to spend the Thanksgiving and Christmas holidays with her and her four children. When he declined, she asked whether he was married or was seeing another woman. Armienti explained that he was in fact married and that he could not leave his wife because she had incriminating information that she would report to law enforcement authorities if he left her. Pressed for elaboration, Armienti stated that he owed a favor to Sasso's father and that he was repaying that debt by "running ... guns" for Sasso. (Tr. at 1012.) Armienti told Kramer that he obtained the guns from an individual he referred to as "Rambo," whom Kramer eventually saw and identified as Van Allen. Kramer recognized Van Allen as someone she had seen with Sasso at Teamster Union meetings.

As a result of Armienti's revelations, Kramer broke off their relationship. They soon reconciled, however, and in February 1992 Armienti began living with Kramer. Thereafter, Kramer observed that Armienti was often paged on his beeper. He left her home to return the page on public telephones, informing her that the calls were from "Rambo." While living with Kramer, Armienti had frequent meetings with Van Allen, and Kramer accompanied him when he set out for six such meetings. Armienti would generally leave Kramer at a restaurant, returning 15–30 minutes later to pick her up. When Armienti returned on one occasion in June 1992, he stated that he had missed his connection with "Rambo"; however, as Kramer and Armienti began to leave the restaurant parking lot, Van Allen arrived. Armienti went to Van Allen's van and was handed a package that he placed in the trunk of his car. Kramer testified that the weight of the package caused the back of the car to sink. Armienti later stated that he had to make a gun delivery to someone he called "Peter," and he showed Kramer one of the guns in the package he had placed in the trunk of the car.

After his meetings with Van Allen, Armienti normally proceeded to meet Sasso. Armienti did not want Sasso to see or know about Kramer, however; thus, she would wait in the car, parked or driving around, while Armienti met Sasso on a street corner. From her vantage point, Kramer observed Armienti meet and speak with Sasso.

Armienti told Kramer that he and his cohorts ground the serial numbers off the guns. They kept a grinder at Sasso's girlfriend's house and were acquiring a second grinder because Armienti had additional customers of his own. He also described an incident that had created problems for him with Sasso's father, in which Armienti had improvidently allowed someone to witness Sasso grinding gun serial numbers.

## B. *The Proceedings in the District Court*

Sasso was indicted in February 1993, and Armienti in August 1993, on the charges indicated above. The jury convicted them on all of those counts.

After the verdicts, defendants moved for a new trial on the basis that Van Allen had committed perjury by testifying (a) that he had not made gun sales after his arrest, and (b) that Sasso, Angelo, and Armienti had bought virtually all of the guns Van Allen sold. The district court denied the motion.

Defendants were sentenced as indicated above, and these appeals followed.

## II. DISCUSSION

On appeal, defendants claim, *inter alia*, that they are entitled to a new trial because their confrontation rights were violated and because there was new evidence that Van Allen committed perjury. We find no merit in any of their contentions.

### A. *Confrontation Claims*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Both defendants contend that their confrontation rights were violated when the trial court ruled that they could not cross-examine Kramer as to her treatment by a psychiatrist and her ingestion of mood-altering drugs. Sasso contends that his rights were further violated by the admission against him of Kramer's testimony as to statements of Armienti that inculpated Sasso. We reject both contentions.

#### 1. *Limitation on the Cross–Examination of Kramer*

At an *in limine* hearing outside the presence of the jury, it was revealed that in 1988, a truck that Kramer was driving accidentally struck and killed a fellow worker. Kramer testified that she became depressed and twice visited a psychiatrist for counseling. Shortly after these two visits, Kramer's family physician prescribed the antidepressant drug Prozac, which Kramer took "on and off" during the following year. Defendants sought permission to bring these facts out in the presence of the jury. They later contended also that Kramer committed perjury in the *in limine* hearing as to the extent of her ingestion of antidepressant drugs. As support for this contention, they proffered pharmacy records showing that Kramer had a Prozac prescription filled in December 1990 and a prescription for Elovil filled in October 1992. Defendants urged that they also be permitted to bring these facts out before the jury. Kramer was recalled before the judge and testified that she did not remember the precise dates of her Prozac prescriptions and that she was unaware that Elovil, prescribed

for her in October 1992 for a degenerative bone disease, had mood-altering properties.

The court denied defendants' requests to explore these matters before the jury, ruling that Kramer's psychiatric history was too remote, both from the period of her relationship with Armienti and from the subject matter of her testimony. Sasso and Armienti contend that this ruling was an abuse of discretion. We disagree.

The Sixth Amendment's guarantee to a defendant of the right to confront the witnesses against him at a criminal trial includes the right to cross-examine. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986); *Davis v. Alaska,* 415 U.S. 308, 317–18 (1974). Nonetheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, [and] confusion of the issues." *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata,* 916 F.2d 795, 806 (2d Cir.1990) (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980)), *cert. denied,* 499 U.S. 940 (1991).

Evidence of a witness's psychological history may be admissible when it goes to her credibility. *See* Fed.R.Evid. 611(b). In assessing the probative value of such evidence, the court should consider such factors as the nature of the psychological problem, *see, e.g., Chnapkova v. Koh,* 985 F.2d 79, 81 (2d Cir.1993) (paranoid and delusional condition likely to be probative), the temporal recency or remoteness of the history, *see, e.g., id.* at 81–82 (paranoid delusions five years earlier not too remote); *United States v. Bari,* 750 F.2d 1169, 1179 (2d Cir.1984) (more than 10 years too remote), *cert. denied,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985); *United States v. Glover,* 588 F.2d 876, 878 (2d Cir.1978) (per curiam) (12 years too remote), and whether the wit-

ness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her "ability to perceive or to recall events or to testify accurately," *United States v. Butt,* 955 F.2d 77, 82 (1st Cir.1992) (internal quotes omitted).

■ The trial court has discretion to limit such evidence if it determines that the probative value of the evidence is outweighed by its potential for unfair prejudice, confusion of the issues, or waste of time. *See* Fed. R.Evid. 403; *Chnapkova v. Koh,* 985 F.2d at 81. Its decisions on these questions will not be overturned in the absence of an abuse of discretion. *See, e.g., id.; United States v. Singh,* 628 F.2d at 763.

We see no abuse of discretion here. In light of the nature of Kramer's condition, *i.e.,* a not-unpredictable depression resulting from her involvement in a specific catastrophic event, the fact that her depression was relatively recent did not necessarily suggest that that condition had any probative value. Further, there was no indication that the accident in which she was involved in 1988 had put her in a delusional state or that any medications prescribed through 1990 or beginning in October 1992 would have affected her ability to perceive events or to understand what was said to her from July 1991, when she first met Armienti, until June 1992, when their intimate relationship ended. Indeed, there was no evidence that Kramer received or ingested any mood-altering drugs during the period in which she was involved with Armienti.

*Chnapkova v. Koh,* on which defendants principally rely to support their contention that the evidence should have been admitted, is entirely distinguishable. In that case, the plaintiff claimed to have been disfigured in plastic surgery, and we held that it was an abuse of discretion for the trial court to exclude evidence that she believed, *inter alia,* that " 'people were laughing at her' " and were talking about her " 'on the T.V. & radio,' " 985 F.2d at 80 n. 1 (quoting hospital records of the plaintiff's statements). That history of paranoid and delusional behavior indicated that the plaintiff suffered problems of perception, and her perceptions were directly related to the subject matter of the

suit. Here, there was no indication that Kramer was delusional or paranoid, or had any difficulties in memory or perception.

■ It was also well within the discretion of the trial court to bar defendants from introducing the December 1990 and October 1992 prescriptions as evidence of her claimed perjury during the *in limine* hearing. In light of Kramer's explanation that she did not recall precise dates and did not know the side-effects of Elovil, defendants' perjury theory was factually weak, and the court appropriately concluded that the potential of the two proffered prescriptions for confusing the issues would far outweigh their probative value. *See also* Fed.R.Evid. 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.").

We note that defendants were able to cross-examine Kramer as to, *inter alia,* her tendency to overreact, such as by frequently summoning the police, and, on one occasion, weeping at being denied permission to take pictures from the top of the Brooklyn Bridge. They also cross-examined her vigorously as to the proposition that she was biased against Armienti for having left her. In all the circumstances, we see no improper limitation on cross-examination.

### 2. *Sasso's* Bruton *Claim*

■ Sasso also claims that his right of confrontation was violated by the admission of Kramer's testimony as to Armienti's statements implicating Sasso in the unlawful weapons activities. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission of nontestifying codefendant's confession may violate defendant's confrontation rights). This argument is largely foreclosed by our decision in *United States v. Matthews,* 20 F.3d 538, 545–46 (2d Cir.1994) ("*Matthews* ").

■ The Confrontation Clause "permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial," *Maryland v. Craig,*

497 U.S. 836, 847–48, 110 S.Ct. 3157, 3164, 111 L.Ed.2d 666 (1990), provided that (1) the declarant is "unavailable" to testify, and (2) the statement "bears adequate 'indicia of reliability,' " *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); *see also Idaho v. Wright,* 497 U.S. 805, 814–15, 110 S.Ct. 3139, 3145–46, 111 L.Ed.2d 638 (1990). The declarant's invocation of his Fifth Amendment privilege against self-incrimination constitutes unavailability. *See, e.g., Matthews,* 20 F.3d at 545; *United States v. Bakhtiar,* 994 F.2d 970, 977 (2d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993).

■ A statement incriminating both the declarant and the defendant may possess adequate reliability if (a) the statement was made to a person whom the declarant believes is an ally, not a law enforcement official, and (b) the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that portion is any less reliable than the part that directly incriminates the declarant. *See, e.g., Lee v. Illinois,* 476 U.S. 530, 541–42, 106 S.Ct. 2056, 2062–63, 90 L.Ed.2d 514 (1986) (inculpation of codefendant resulting from police interrogation of declarant does not of itself bear sufficient indicia of reliability to satisfy Confrontation Clause); *Matthews,* 20 F.3d at 545–46 (contrasting reliability of statements to authorities with that of statements to friends). In *Matthews,* we concluded that trustworthiness was adequately indicated by the facts that the statements were volunteered by the declarant to his girlfriend in the private recesses of their home, with no coercive pressures from or attempt to curry favor with authorities, no reason to expect that his admission would ever be disclosed to the authorities, and no attempt to shift blame or minimize the declarant's own culpability. 20 F.3d at 546.

Sasso relies heavily on the Supreme Court's recent decision in *Williamson v. United States,* — U.S. ——, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (*"Williamson"*), which held that under Fed.R.Evid. 804(b)(3), a court must determine whether a particular hearsay statement which incriminates someone other than the declarant is itself inculpa-

tory of the declarant rather than whether the entire narrative of which the statement is a part is self-inculpatory. *Id.* — – ——, 114 S.Ct. at 2434–37. *Williamson* is not inconsistent with *Matthews.* First, whereas *Matthews* concerned only a Confrontation Clause challenge, *see* 20 F.3d at 544–46, *Williamson* was limited to the hearsay rule, *see* — U.S. at ——, 114 S.Ct. at 2437 ("we need not address Williamson's claim that the statements were also made inadmissible by the Confrontation Clause"). Furthermore, the analyses in the two cases are consistent. In *Williamson,* the Court interpreted the term "statement" within 804(b)(3) narrowly because it recognized that a declarant might attempt to shift blame to another by mixing within a narrative true self-inculpatory statements and false blame-shifting ones. *See* — U.S. at ——, 114 S.Ct. at 2435. *Matthews* too recognized this problem, *see* 20 F.3d at 545 ("to the extent that the declarant's statement implicates another person in the crime, it may in some circumstances constitute an attempt to minimize the declarant's own culpability"), and for this reason we rested our decision on the " 'particularized guarantees of trustworthiness' " surrounding the statements, including the fact that the statements inculpated both the declarant and defendant equally, rather than relying on mere proximity to statements inculpatory of the declarant, *id.* at 546.

The circumstances of Armienti's statements to Kramer strongly suggest that his inculpation of Sasso was reliable. First, Armienti's statements inculpating Sasso equally inculpated Armienti himself in the gun-running conspiracy. There was no effort to shift blame from himself to Sasso. Second, Armienti initially inculpated Sasso in the course of explaining to Kramer that he could not leave his wife because she knew he was gun-running and would tell the police. Implicating Sasso added nothing to the reason Armienti could not leave his wife. If his wife was holding it over his head that he was gun-running, she would be doing so whether his confederate was Sasso or someone else. Thus, even if Armienti were lying about the reason he would not leave his wife, there would have been no reason to falsely bring Sasso into the picture. Armienti also made

later statements to Kramer implicating Sasso; those statements by Armienti apparently had no connection with any attempt to explain his marital status. Third, the statements were made to Kramer in private; there was no police or other official interrogation. There was no indication that, when Armienti made his statements to Kramer, the authorities had any knowledge of Armienti's crimes; hence there was no possibility that Sasso was implicated solely to curry favor with the authorities. Finally, it is unlikely that Armienti would have named Sasso as a participant in Armienti's gun-running activities in an attempt to curry favor with Kramer herself. Sasso points out in his brief on appeal that Armienti knew Kramer disliked Sasso. Since, in seeking to placate Kramer, Armienti would be quite unlikely to fabricate his association with someone of whom she disapproved, his statement to Kramer that his gun-running partner was Sasso must be viewed as having strong indicia of truthfulness.

Given the totality of the circumstances as to the content and context of Armienti's statements to Kramer, we conclude that the statements bore sufficient indicia of reliability that their admission against Sasso did not violate Sasso's confrontation rights.

### B. *The Motion for a New Trial*

 Following the jury verdicts, defendants moved in the district court for a new trial, arguing that they had newly discovered evidence that Van Allen perjured himself at trial by testifying (1) that he had not violated his cooperation agreement with the government, and (2) that in 1992 he had sold guns almost exclusively to Sasso. The district court denied the motion on the grounds that it was not sufficiently factually supported and that the proffered evidence would not have altered the jury's verdict. Defendants contend that the court erred in so ruling and in not holding an evidentiary hearing. We disagree.

 A motion for a new trial based on new evidence is to be granted "only with great caution ... in the most extraordinary circumstances," *United States v. DiPaolo*, 835 F.2d 46, 49 (2d Cir.1987) (internal quotes

and emphasis omitted), where it is "required in the interest of justice," Fed.R.Crim.P. 33. Such relief should be granted only if the evidence is material to the verdict, could not with due diligence have been discovered before or during trial, and is not cumulative. *See, e.g., United States v. White*, 972 F.2d 16, 20–21 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 669, 121 L.Ed.2d 593 (1992). Where the allegation is that there is new evidence of perjury, "a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." *Id.* at 20. If the court finds that perjury was committed unbeknownst to the prosecutor, the materiality element is satisfied if "the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). *Cf. id.* ("Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (internal quotes omitted)). It is the defendant who bears the burden of showing that a new trial is called for. *See, e.g., United States v. Moore*, 54 F.3d 92, 99–100 (2d Cir.1995); *United States v. DiPaolo*, 835 F.2d at 49. We will not reverse the denial of a new-trial motion or the refusal to conduct an evidentiary hearing absent an abuse of discretion. *See, e.g., id.* at 51.

In the present case, defendants' motion initially asserted that Van Allen had continued to sell weapons in 1993, and that because his January 12, 1993 cooperation agreement included a pledge not to sell firearms, he therefore perjured himself when he testified at trial that he had complied with that agreement. The motion was supported by a Sasso affidavit stating principally that one Michael Philmus said Van Allen had sold Philmus a gun, whose serial number was specified in the affidavit, "early in 1993." However, the government submitted documentary evidence that the gun bearing that serial number had in fact been transferred by Van Allen to Philmus through a licensed Long Island dealer in July 1992. Defendants, whose proffer was based on hearsay, offered the district

court no reason to doubt the veracity of these documents.

The Sasso affidavit also cited an unsworn investigative report as stating that Philmus had "confirmed" that Van Allen sold guns on a certain college campus after his arrest. Given the evidentiary frailties in this assertion, including the reliance on an unsworn communication from a private investigations firm, the conclusory nature of the hearsay statement attributed to Philmus, and the apparent lack of Philmus's personal involvement in the transactions he was alleged to have "confirmed," along with the fact that as to the above-described transaction to which Philmus actually had been a party he was six months wide of the mark in recalling its time frame, the court was hardly required to find the representations in the Sasso affidavit sufficed to warrant a hearing.

In a reply memorandum submitted in support of the new-trial motion, defendants also argued that Van Allen had committed perjury by failing to admit at trial that he sold guns to persons other than defendants; they contended that Van Allen sold 10–15 guns to Philmus. Given Van Allen's testimony that he had purchased and sold nearly 3,000 guns during the period at issue, had sold some 2,000 guns to Sasso in 1992, and had made "99 and a half percent" of his 1992 sales to Sasso (Tr. at 430), the sale of 10–15 guns to a person other than the defendants, even if provable, is not substantially inconsistent with his testimony. In any event, in light of defendants' vigorous cross-examination of Van Allen, which included questions tending to show that some of his initial statements to investigators about sales to Sasso had been inaccurate and that some of the purchases he attributed to Sasso took place during a period when he was not in contact with Sasso, it was well within the court's discretion to find that any impeachment through use of the newly proffered alleged numerical inaccuracy would have been, at best, cumulative.

In sum, we see no abuse of discretion in the court's conclusions that defendants' contention that Van Allen had continued to sell weapons in 1993 was not sufficiently supported, that the alleged numerical discrepancy would not have altered the jury's verdict,

and that no evidentiary hearing was required.

## C. *Other Contentions*

Defendants' other contentions include their argument that certain materials should have been turned over to them under the Jencks Act, 18 U.S.C. § 3500 (1988) (witness statements), and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (exculpatory materials), and Armienti's complaint that after indicting him, the government improperly caused a grand jury subpoena to be issued for his telephone records for use at trial. Neither contention warrants extended discussion.

■ The Jencks Act provides, in pertinent part, that a statement in the possession of the government, made by a person called thereafter by the government as a witness in a criminal trial, may be discovered by the defendant after the witness has testified on direct examination at trial. 18 U.S.C. § 3500(a). The term "statement" is defined to include not only a prior written statement that the witness had signed or adopted, but also a contemporaneously prepared "substantially verbatim" written record of the witness's oral statement. 18 U.S.C. § 3500(e). The statute does not, however, require the government to divulge even verbatim statements by the witness if the writer "merely select[ed] portions, albeit accurately, from a lengthy oral recital." *Palermo v. United States,* 360 U.S. 343, 352, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959).

■ We have examined *in camera* the materials requested by defendants in the present case. We conclude that the trial court properly determined that they were not *Brady* or Jencks Act material.

■ As to Armienti's claim of misuse of the power of the grand jury, it is of course improper for the government to use a grand jury subpoena "for the sole or dominant purpose of preparing for trial under a pending indictment." *United States v. Leung,* 40 F.3d 577, 581 (2d Cir.1994). Where there was some proper dominant purpose for the postindictment subpoena, however, the government is not barred from introducing evi-

dence obtained thereby. *See id.* There is a presumption that such a subpoena had a proper purpose. *See id.* at 582.

██ In this case, the government explained that after the indictment of Armienti, it continued, *inter alia*, to investigate other individuals whom Kramer had identified only by their first names—*e.g.*, "Peter" to whom Armienti delivered guns—as being part of Sasso and Armienti's gun-running scheme. The grand jury sought Armienti's telephone records in an effort to identify those individuals and to determine whether calls were made between them and Armienti on the days on which guns were being transferred.

We have reviewed the government's submissions and conclude that the trial judge's determination that the government's proffer was sufficient was not erroneous.

### D. *Armienti's Sentencing Challenges*

#### 1. *The Fine*

██ The presentence report ("PSR") prepared on Armienti by the Probation Department stated that it appeared that Armienti would be unable to pay a fine. On the strength of that opinion, Armienti challenges the $50,000 fine imposed on him, pointing out that the government did not object to the PSR, and arguing that the court did not articulate a reason for the amount of the fine or indicate that it had considered the requisite factors. We see no error.

The Guidelines provide that "[t]he court *shall* impose a fine in all cases, *except where the defendant establishes* that he is unable to pay and is not likely to become able to pay any fine." Guidelines § 5E1.2(a) (emphasis added); *see also* 18 U.S.C. § 3572(a)(1) (1988) (in imposing a fine, a court is to "consider ... the defendant's income, earning capacity, and financial resources"). The burden is on the defendant to show inability to pay. *See, e.g., United States v. Marquez*, 941 F.2d 60, 65–66 (2d Cir.1991). Where a fine falls within the Guidelines range, there is no requirement that the court state why it chose that fine. *See id.* at 65.

██ The court is not required to accept a defendant's unsubstantiated claim of penury,

and it is entitled to reject such a claim when he has refused to cooperate with the Probation Department in exploring his financial resources. *See, e.g., United States v. Rivera*, 22 F.3d 430, 440 (2d Cir.1994) (sentencing court properly rejected claim of indigence that was based solely on defendant's own self-serving statements that he was without assets, where defendant also expressed a desire to discharge his appointed counsel and to retain counsel of his choosing); *United States v. Rosa*, 11 F.3d 315, 344 (2d Cir.1993) (same where, *inter alia*, defendant was less than forthright in refusing to disclose his earnings from his legitimate business, and he was part owner of a home), *cert. denied*, —— U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994); *United States v. Marquez*, 941 F.2d at 66 (court is "surely not required to accept uncritically a representation" by the defendant that he has no assets).

In the present case, the Guidelines fine range for Armienti was $12,500–$125,000, and Armienti provided no corroboration for his claim of inability to pay. Though the PSR stated that it appeared that Armienti would be unable to pay a fine, it also noted, *inter alia*, that Armienti had been employed under an alias for more than a decade and that he refused to execute forms necessary for the release of his tax and financial records so that the Probation Department could verify his financial status. Since Armienti was not forthcoming with respect to his financial circumstances, it was well within the province of the district court to find that he had not carried his burden of proving inability to pay.

#### 2. *Other Sentencing Challenges*

Armienti's other sentencing challenges include the contentions that the district court (a) failed to explain its reason for sentencing him at the top of the Guidelines range; (b) erred in enhancing his sentence pursuant to Guidelines § 2K2.1(b)(4) for defacement of serial numbers; and (c) erroneously failed to find that he played a minimal role in the offense. These contentions are likewise meritless.

██ As to the first contention, the Guidelines range applicable to Armienti was 92–

115 months. The Sentencing Reform Act requires that the court explain the reason for its selection of a point within a Guidelines range only when "that range exceeds 24 months." 18 U.S.C. § 3553(c)(1) (1988); *see United States v. Martinez–Gonzalez,* 962 F.2d 874, 879 (9th Cir.1992) (requirement inapplicable where range is less than 24 months).

As to the other two issues, facts in connection with sentencing need be established only by a preponderance of the evidence, *see, e.g., United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993), and the sentencing court's findings of fact will not be overturned unless clearly erroneous, *see, e.g., United States v. Rivera,* 971 F.2d 876, 893 (2d Cir. 1992). A defendant who contends that he is entitled to a reduction in offense level because his role was minimal has the burden of proving that fact. *See, e.g., United States v. Garcia,* 920 F.2d 153, 156 (2d Cir.1990) (per curiam).

There was ample evidence in the present case that Armienti was entrusted by Sasso with money for delivery to Van Allen, and that he repeatedly picked up guns from Van Allen and delivered them to or for Sasso. Further, though Van Allen testified that he never saw Armienti deface guns, Armienti himself told Kramer of his involvement in grinding the serial numbers off the guns. It was well within the province of the district court to find that Armienti failed to establish that he did not play more than a minimal role in the offense.

Armienti's contention that there was insufficient evidence to warrant enhancement of his sentence for defacement of serial numbers is not properly preserved for appeal, since Armienti did not make this argument in the district court. *See, e.g., United States v. Keppler,* 2 F.3d 21, 23–24 (2d Cir.1993); *United States v. Agramonte,* 980 F.2d 847, 850 (2d Cir.1992) (per curiam). In any event, the contention is without merit in light of the evidence discussed above. Armienti's reliance on *Opper v. United States,* 348 U.S. 84, 89–90, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954), is misplaced, since that case dealt with the sufficiency of an uncorroborated confession to police to establish guilt at a criminal trial beyond a reasonable doubt, not with sufficiency to meet the preponderance standard applicable to sentencing.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are affirmed.