UNITED STATES of America

v.

Lawrence SAVOCA and
Salvatore Savoca

No. 03 CR. 841(SCR).

United States District Court,
S.D. New York.

April 16, 2004.

Thomas J. Lee, Bronx, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge.

### I. *INTRODUCTION:*

#### A. PROCEDURAL HISTORY:

Lawrence Savoca and Salvatore Savoca (collectively, the "Defendants") have filed a Joint Omnibus Motion (the "Defendants' Motion"). The Defendants' Motion makes three primary arguments; two of those arguments are made jointly by the two Defendants and the third argument is made only by Lawrence Savoca. First, Lawrence Savoca moves individually to exclude a pre-arrest statement allegedly made by Salvatore Savoca to his then live-in girlfriend, Nicole Pocchia ("Ms. Pocchia"). Second, the Defendants jointly move, pursuant to Rule 14 of the Federal Rules of Criminal Procedure for severance and separate trials. Third, the Defendants jointly move to dismiss Counts One and Two of the indictment (the "Indictment"), which allege a conspiracy and an attempt to violate the Hobbs Act, 18 U.S.C. § 1951. The Defendants argue that said counts of the indictment fail to plead the indispensable, statutory element that the charged conduct affected interstate commerce. The Government filed a memorandum of law in opposition to the Defendants' Motion (the "Government's Opposition") and the Defendants filed a reply to the Government's Opposition (the "Reply").

#### B. BACKGROUND:

The charges in the Indictment stem from an incident that occurred during the early morning hours of June 21, 2001 in Mahopac, New York. The Government alleges that the Defendants attempted an armed robbery of the owner of the Rhino Bar [1], Michael Geary ("Mr. Geary"), outside his home. During the course of the alleged robbery, Mr. Geary was shot in the leg. The Government alleges that on the night of the shooting incident, Ms. Pocchia, Salvatore Savoca's live-in girlfriend, saw Lawrence Savoca drive Salvatore Savoca home following the attempted robbery and shooting. Additionally, the Government alleges that Salvatore Savoca subsequently made certain incriminating statements to Ms. Pocchia. The alleged statements, which are set forth in their entirety below, implicate both Salvatore Savoca and Lawrence Savoca. More particularly, the

---

1. The Rhino Bar is located in Mahopac, New York.

statements provide a detailed picture of (a) the Defendants' motive—Salvatore Savoca and Lawrence Savoca allegedly owed approximately $70,000 to a bookie for gambling debts, (b) the events leading up to the incident, (c) the incident itself, and (d) the events immediately following the incident.

## C. THE STATEMENTS:

Ms. Pocchia has told law enforcement officials the following account based on Salvatore Savoca's statements to her:

At about 3:30 am on June 21, 2001, he [Salvatore Savoca] was in the woods by the Geary residence. He and Larry [Lawrence Savoca] owed around $70,000 in gambling debts to a bookie and they had to come up with some money. Larry had devised a plan to rob Mike Geary of the receipts from the bar after Geary came home one morning. Larry had threatened him [Salvatore Savoca] into doing this. He and Larry had followed and watched Mike Geary for two weeks prior to the shooting. They had followed Geary to his house several times and had become familiar with his patterns. On the night Geary was shot, Larry dropped him [Salvatore Savoca] off near the Geary residence and then drove down the road out of sight. Larry had given him a gun with which to hold up Geary, a gun that he [Lawrence Savoca] had obtained from a friend. He [Salvatore Savoca] went to the Geary residence and hid in a wooded area near the house. He waited until Geary pulled into his driveway and got out of his car before he confronted him. He walked over to Geary and said in a disguised voice, "Give me the money." He was pointing a gun at Geary as he did so. He had his mother's stocking over his face to disguise his appearance. When he pointed the gun at Geary and demanded the money, Geary refused to comply, and Geary then began to scream and growl at him. Geary then started moving towards him in a brisk manner. He [Salvatore Savoca] became scared and pulled the trigger. He shot Geary and then ran off down the road. He put the gun in a trashcan somewhere near the house. He then met Larry down the road and got into the car. Larry was angry that he did not have the gun with him, and they went back and found it a short time later.

The Government has indicated that it intends to offer the above statements through the testimony of Ms. Pocchia at trial.

## II. ANALYSIS:

### A. ADMISSIBILITY OF SALVATORE SAVOCA'S STATEMENTS TO MS. POCCHIA:

Lawrence Savoca has objected to the admission of the statements allegedly made by his co-defendant and brother, Salvatore Savoca, to Ms. Pocchia. In support of this objection, Lawrence Savoca has advanced two alternative theories seeking to prevent the introduction of those statements. First, he argues that the statements are hearsay and do not fall within an exception to the hearsay rule. Alternatively, Lawrence Savoca contends that admission of the statements against him would be in violation of his Confrontation Clause Rights under the Sixth Amendment.

### 1. Hearsay:

█ In the case at bar, the Government concedes that Salvatore Savoca's admissions within the statements are hearsay. It is well established that Rules 801 and 802 of the Federal Rules of Evidence bar the admission of hearsay unless it falls into one of the exceptions to the hearsay rule contained in Rules 803, 804 or 807. Notwithstanding the fact that the statements are hearsay, the Government submits that

the statement is admissible against both Salvatore Savoca, the declarant, and his co-defendant, Lawrence Savoca, under Fed.R.Evid. 804(b)(3), which allows for the admission of a statement against a declarant's interest if the declarant is unavailable as a witness at trial. Rule 804(b)(3) provides, in relevant part, that:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability...that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

*Id.*

 In the case at bar, the "unavailability" component is established by the fact that Salvatore Savoca is expected to invoke his Fifth Amendment privilege, making him "unavailable" as defined by Rule 804(a)(1). *United States v. Matthews*, 20 F.3d 538, 545 (2d Cir.1994); *United States v. Bakhtiar*, 994 F.2d 970, 977 (2d Cir. 1993). A witness need not be physically brought into court to assert his or her Fifth Amendment privilege; the government's representation that the pleading defendant's lawyer has been contacted and that such attorney stated that his client would assert the Fifth Amendment privilege is sufficient. *See e.g. United States v. Williams*, 927 F.2d 95, 98–99 (2d Cir.1991). For the purposes of this Motion, this Court will assume that Salvatore Savoca will exercise his Fifth Amendment privilege at trial. To the extent, Salvatore Savoca waives his privilege, Lawrence Savoca's motion to preclude the admission of the statements will become moot. Fur-

ther, it is undisputed that the statement made by Salvatore Savoca is contrary to his penal interest and subjects him, as the declarant, to criminal liability. The Defendants have not contested the admissibility of the statement against Salvatore Savoca. Accordingly, this Court finds that the statement at issue survives Lawrence Savoca's challenge on hearsay grounds.

### 2. *Confrontation Clause Issue:*

Having found that Salvatore Savoca's statements are admissible hearsay pursuant to Rule 804(b)(3), this Court must now address the Defendants' second contention; that the statements should be precluded as to Lawrence Savoca on Sixth Amendment, Confrontation Clause grounds.

 The Sixth Amendment to the Constitution, Rights of the Accused, provides that:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him;* to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

U.S.C.S. Const. Amend. 6 (2003) (emphasis added). The purpose of the "Confrontation Clause" is to ensure that defendants have the opportunity to subject the government's evidence to cross-examination. *See Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Confrontation Clause protects interests, which are similar to those protected by the rules against hearsay.

a. *Crawford* Holding:

The Supreme Court in *Crawford v. Washington*, 541 U.S. ——, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (slip opinion)[2] traced the development of the Confrontation Clause jurisprudence; beginning with English common law and extending to recent decisions made by state and federal courts throughout the country. As a threshold matter, the Supreme Court's analysis identified the "principal evil," which the Confrontation Clause was intended to deter, "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford* at ——, 124 S.Ct. at 1355. The Supreme Court rejected the view that the regulation of out-of-court statements could be accomplished solely by the rules of evidence. *Id.* The Court held that the Confrontation Clause was established to prevent "flagrant inquisitorial practices." *Id.* at —————, 124 S.Ct. at 1355–56.

The holding in Crawford sets forth the test for when the Confrontation Clause is implicated by hearsay statements:

*Where nontestimonial hearsay* is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—*as does Roberts[Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)]*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence* is at issue, however, the Sixth Amendment demands what the common

law required: unavailability and a prior opportunity for cross-examination. *Crawford* at 1374 (emphasis added).

In the wake of the *Crawford* decision, the crucial inquiry is whether a particular statement is testimonial or non-testimonial. To the extent the statement is deemed testimonial, *Crawford* makes it clear that the Confrontation Clause cannot be ignored in deference to the hearsay rules and their exceptions. However, if a statement is determined to be non-testimonial, *Crawford* does not apply and the pre-*Crawford* analysis once again controls. While the holding of the *Crawford* decision draws a stark distinction between "testimonial" and "non-testimonial statements," with respect to admissibility, the Supreme Court declined to enumerate exactly which statements fall into which category. In fact, the Court explicitly elected to "leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford* at ——, 124 S.Ct. at 1374.

The *Crawford* Court stated that "[a]n accuser who makes a *formal statement to government officers* bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at ——, 124 S.Ct. at 1364 (emphasis added). Additionally, *Crawford* recognizes that "constitutional text, like the history underlying the common-law right of confrontation, thus reflects an *especially acute concern with a specific type of out-of-court statement.*" *Id.* (emphasis added). The Court held that "[w]hatever else the term [testimonial] covers it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a

**2.** As of March 8, 2004, the Confrontation Clause issue had been briefed, the parties had made oral argument, and this Court was in the process of reaching a decision on the issue. On that date, the Supreme Court announced its decision in *Crawford*. Subsequent to the release of the *Crawford* decision,

this Court asked the Government and the Defendants to submit additional briefing setting forth their respective positions regarding the impact of *Crawford*. Additionally, this Court held a second oral argument, limited to the discussion of what, if any, impact *Crawford* had on the parties' positions.

former trial; and to police interrogations. These are the practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at ——, 124 S.Ct. at 1372.

■ This language leads to the conclusion that *Crawford* is only intended to apply to a class of "testimonial" statements, which statements were made in the context of some governmental action. There is no question that the statements allegedly made by Salvatore Savoca in the case at bar were made to an acquaintance who had no connection to any law enforcement official or proceeding and they were not formal statements to a government official. Accordingly, this Court finds that the statements were not the type of out-of-court statements with which the Framers or the *Crawford* Court were "acutely concerned."

As indicated above, the *Crawford* Court declined to draw an exact definition or define a class of statements that are "testimonial"; however, the decision acknowledges that "various formulations" of "testimonial" statements have been made. The opinion notes that the Brief of the Petitioner described "testimonial statements" as "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." *Crawford* at ——, 124 S.Ct. at 1364 (citing Brief of the Petitioner at 23). The *Crawford* Court also recognized its past jurisprudence in *White v. Illinois,* where the Supreme Court classified testimonial statements as those which would include "extrajudicial statements . . . contained in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions." *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The broadest definition of testimonial statements mentioned in *Crawford,* which was offered by the National Association of Criminal Defense Lawyers, defines them as "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" *Crawford* at ——, 124 S.Ct. at 1364.

In *Crawford* the Court made further distinctions between "testimonial statements" and "non-testimonial statements." More particularly, the *Crawford* decision states that "***testimonial statements*** of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford* at ——, 124 S.Ct. at 1369 (emphasis added). Additionally, the Court wrote that "[w]here ***testimonial statements*** are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability'." *Crawford* at ——, 124 S.Ct. at 1370 (emphasis added). Finally, the *Crawford* decision concluded that "[w]here ***testimonial statements*** are in issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at ——, 124 S.Ct. at 1374 (emphasis added). To the contrary, the Court found that when "***non-testimonial hearsay*** is at issue," the *Roberts* test would be appropriate, "as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.*

Although the *Crawford* Court explicitly stated that the proffered list of "testimonial statements" was not exhaustive, all of the examples provided contain an "official" element. While the statements may or

may not have been sworn, each example was made to an authority figure in an authoritarian environment. This element of officiality appears to be the hallmark of a "testimonial statement." Significantly, in the current case, there is no official involvement with the statements offered by the Government. It is difficult to conceive of a statement that could be made in less "official" surroundings to a less official figure and in a less coercive atmosphere than a statement offered in one's home to one's significant other. When Salvatore Savoca made the statements to Ms. Pocchia, it is equally inconceivable that he thought he was giving any sort of testimony or that his statements would later be available for use at any official proceeding. Likewise, it cannot be argued that the statements were made to curry favor with law enforcement authorities. Accordingly, this Court finds that the statements at issue are not the type of statements that were deemed objectionable in *Crawford* and do not fall into the category of "testimonial statements." Therefore, Salvatore Savoca's statements are not subject to the "testimonial statement" analysis set forth in *Crawford* (an absolute bar in the absence of confrontation), but, instead, are subject to the traditional, pre-*Crawford* analysis, which remains applicable to "non-testimonial" statements.

 As set forth above, the Supreme Court in *Crawford* outlined three levels of acceptable scrutiny; two for non-testimonial hearsay and one for testimonial hearsay. In the case of testimonial statements, the statement will be admissible only after the defendant has had the opportunity for cross-examination. However, when non-testimonial hearsay is at issue, a District Court may (1) follow the *Roberts* inquiry (as has the Second Circuit), or (2) exempt such evidence from Confrontation Clause analysis. This Court elects, consistent with the Second Circuit's jurisprudence on this issue, to conduct a *Roberts* inquiry. This Court recognizes the *Crawford* Court's view that out-of-court statements must be admissible under both hearsay rules and Confrontation clause analysis. See *Crawford* at 1355. In other words, non-testimonial statements such as Salvatore Savoca's statements in the case at bar, which are not *per se* inadmissible in the absence of cross-examination under *Crawford*, should still be analyzed using the *Roberts* analysis. Although the Defendants submit that *Roberts* has no continuing viability post-*Crawford*, this Court disagrees. In fact, the *Crawford* Court explicitly upheld the application of *Roberts* when non-testimonial hearsay is at issue. *Crawford* at 1374. Accordingly, because this Court finds that the statements in question are non-testimonial hearsay, the *Roberts* inquiry, and the subsequent Supreme Court and Second Circuit decisions applying and interpreting *Roberts* shall control this case.

Having found that the statements are non-testimonial hearsay, this Court must now perform an analysis consistent the Confrontation Clause case law established by the Supreme Court and the Second Circuit prior to the recent *Crawford* decision.

 In the context of a criminal case, the general rule is that a statement made out-of-court (and thus not subject to cross-examination) only may be admitted against the defendant if the proponent of the evidence satisfies its burden of showing that the admission of that evidence does not violate the defendant's rights under the Confrontation Clause. *Idaho v. Wright*, 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). That burden may be satisfied in one of two ways, the evidence must: (1) be a firmly rooted hearsay exception or (2) contain particularized guarantees of truthfulness. *Lilly v. Virginia*, 527 U.S. 116, 124–25, 119 S.Ct. 1887,

144 L.Ed.2d 117 (1999) (citing *Roberts* at 66, 100 S.Ct. 2531).[3] With respect to the first category it must be shown that "the evidence falls within a firmly rooted hearsay exception[.]" *Id.* The Supreme Court stated that the "firmly rooted hearsay exceptions" include "dying declarations" and "spontaneous declarations" (a/k/a "excited utterances"). *Id.* at 126, 119 S.Ct. 1887. Although the Second Circuit has not yet opined as to whether hearsay statements admissible under Rule 804(b)(3), such as the statements made by Salvatore Savoca in the case at bar, fall within a firmly rooted exception to the hearsay rule, the Second Circuit has relied on the second category and discussed what constitutes particularized guarantees of trustworthiness. *See e.g. United States v. Matthews*, 20 F.3d 538 (2d Cir.1994), *United States v. Sasso*, 59 F.3d 341 (2d Cir.1995) and *United States v. Bryce*, 208 F.3d 346 (2d Cir. 1999).

■■■ With respect to this second category, it must be established that the statement being evaluated "contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly* at 124–25, 119 S.Ct. 1887 (citing *Roberts* at 66, 100 S.Ct. 2531). In determining whether a certain statement contains a "particularized guarantee of trustworthiness" sufficient to allow its admission without violating a defendant's Confrontation Clause rights, the District Court should "consider the totality of those circumstances 'that surround the making of the statement and that render the declarant particularly worthy of belief.'" *United States v. Dhinsa*, 243 F.3d 635, 655 (2d Cir.2001) (quoting *Wright*, 497 U.S. at 819, 110 S.Ct. 3139); *see also Bryce*, 208 F.3d at 351; *Mingo v. Artuz*, 174 F.3d 73,

77 (2d Cir.1999) (requiring a court to "carefully examine each instance of incriminating hearsay in the light of all the circumstances").

As indicated above, the key question to be decided in this case is whether the statements allegedly made by Salvatore Savoca to his live-in girlfriend, Ms. Pocchia, may be introduced against his codefendant, and brother, Lawrence Savoca. More particularly, do these statements contain sufficient and particularized guarantees of trustworthiness such that their admission will not violate Lawrence Savoca's rights under the Confrontation Clause of the Sixth Amendment. In the past ten years there have been a number of decisions by the Second Circuit and Supreme Court, which have required those Courts to balance the Government's interest in admitting a co-defendant's statement against a defendant with that defendant's Confrontation Clause rights, and this Court must perform a chronological analysis of that case law. This Court's analysis begins with *United States v. Matthews*, a Second Circuit decision from 1994.

The District Court, and then the Second Circuit, in *United States v. Matthews* faced an issue almost identical to the one in the case at bar. Due to the substantial similarities between the facts of that case, it warrants a detailed review and analysis by this Court. In *Matthews*, one defendant sought to preclude the admission at trial of a co-defendant's out-of-court statements that implicated the defendant in a robbery on Confrontation Clause grounds. The Government contended that the testimony did not violate the defendant's Confrontation Clause Rights because it was admissible under the hearsay exception for statements against penal interest and because

---

**3.** As noted elsewhere, *Lilly* was a plurality opinion. However, it should be noted that the concurring opinion also favorably refer-

enced the *Roberts* "dual inquiries." *Id.* at 144 and 148–49, 119 S.Ct. 1887.

it was inherently reliable. The Second Circuit only addressed the Government's latter contention. *Matthews* at 544.

In *Matthews*, the Second Circuit was persuaded that the trustworthiness condition had been met due to the nature of the circumstances and content of the co-defendant's statements. *Id.* at 546. More specifically, the Court relied on the following facts:

> **The statements were not made to law enforcement authorities, were not made in response to questioning, and were not made in a coercive atmosphere. Rather, they were volunteered by [the co-defendant] to his girlfriend, an intimate and confidante, in the private recesses of their home. There were no coercive pressures, and there was no attempt to curry favor with authorities.** Indeed, when he made the statement to [his girlfriend], [the co-defendant] had no reason to expect that his admission would ever be disclosed to the authorities. Further, the statements do not reflect any attempt by [the co-defendant] to minimize his own culpability. Rather, [the co-defendant] implicated himself in all aspects of the robbery. He admitted that he entered the bank, that he carried a gun, and that he went behind the counter to seize the money. Nor was there any effort to make [the defendant] seem more culpable than [the co-defendant].

*Id.* at 546 (emphasis added). Overall, the Court found that nothing in the contents of the statements or the circumstances in which they were made that would shift blame to his co-defendant or cause it to believe the statement was not trustworthy. *Id.* Therefore, "[g]iven the totality of the circumstances as to the content and con-

text of [the co-defendant's] statements" the Second Circuit concluded that the statements had sufficient "particularized guarantees of trustworthiness" such that their admission did not violate the defendant's rights under the Confrontation Clause. *Id.*

After the Second Circuit's decision in *Matthews*, the Supreme Court decided *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), which also addressed the admissibility of co-defendant statements under the Confrontation Clause. As a threshold matter, it should be noted that the statements at issue in *Williamson* were post-arrest statements made by a co-defendant/declarant to a Special Agent of the Drug Enforcement Administration ("DEA"). In that case the co-defendant/declarant was stopped by a local sheriff for erratic driving. *Williamson* at 596, 114 S.Ct. 2431. After receiving consent, the sheriff searched the vehicle and found nineteen kilograms of cocaine in two suitcases in the trunk. *Id.* The co-defendant/declarant was immediately arrested. Subsequently, while the co-defendant/declarant was at the local police station, under arrest and in custody, he was interviewed (by telephone) by the DEA. *Id.* During that conversation, and a subsequent interview in person, the co-defendant/declarant gave statements, which were extremely incriminating to both himself and his co-defendants. *Id.* at 596–97, 114 S.Ct. 2431.[4]

As noted above, the *Matthews* Court used the "particularized guarantees of trustworthiness" standard to determine admissibility. The Supreme Court in *Williamson* concurred with this approach and stated that the "very fact that a statement

---

4. It should also be noted that the co-defendant/declarant in that case gave an initial statement, which differed from his ultimate statement. This contradiction may have col-

ored the Court's judgment with respect to the truthfulness of the statements, which is an important part of this Court's inquiry.

is genuinely self-inculpatory...is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause." *Williamson* at 605, 114 S.Ct. 2431. The Court in *Williamson* cautioned that "the fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Williamson* at 600, 114 S.Ct. 2431. Further, the holding in *Williamson* indicates that each particular assertion in a narrative should be interpreted within the context of the circumstances under which it was made to determine if that assertion is in fact sufficiently against interest. *Williamson* at 603–04, 114 S.Ct. 2431. Therefore, the Second Circuit has interpreted *Williamson* as standing for the proposition that the admission of statements by co-defendants "do not offend the Sixth Amendment's Confrontation Clause so long as non-self-inculpatory parts of the statement, particularly parts that are actually self-exculpatory or that name the defendant, are omitted or redacted." *See e.g. United States v. Sanin,* 1997 WL 280083 at *4 (2d Cir.1997), 1997 U.S.App. LEXIS 12280 at *12 (citing *Williamson* at 600, 114 S.Ct. 2431).

The Second Circuit's decision in *United States v. Sasso,* 59 F.3d 341 (2d Cir.1995) is a critical decision in this analysis because it was decided after *Williamson* and represents the Second Circuit's reaction to the *Williamson* decision. In *Sasso,* the Second Circuit found a significant distinction between the Supreme Court's decision and the case before them. Further, *Sasso* is significant because that decision expressed the Second Circuit's approval for the *Matthews* decision, even in a post-*Williamson* context.

The *Sasso* decision also involved a defendant's challenge that his right of con-frontation was violated by the admission of a co-defendant's statement implicating that defendant in criminal activity. *Id.* at 349. Ironically, the statement at issue in *Sasso,* as in *Matthews* and the case at bar, was made to the girlfriend of the co-defendant. The defendant in *Sasso* attempted, as does Lawrence Savoca in the current case, to rely on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) in support of his argument; however, the Second Circuit ruled that this "argument is largely foreclosed by [its] decision in *United States v. Matthews* [.]" *Sasso* at 349. Additionally, the defendant in *Sasso* based his argument heavily on the Supreme Court's decision in *Williamson v. United States.*

Significantly, the *Sasso* Court analyzed the *Matthews* holding post-*Williamson;* finding that the two decisions were not in conflict with one another. As an initial matter, the *Williamson* holding was limited to the hearsay rule, but *Matthews* was a Confrontation Clause challenge. *Sasso* at 349 (citing *Williamson* at 597–99, 114 S.Ct. 2431 and *Matthews* at 544–46.) Further, both decisions recognized the potential problem of "blame-shifting." *Williamson* at 599–600, 114 S.Ct. at 2435; *Matthews* at 545. For this reason, in *Matthews* the Second Circuit rested its holding on the "particularized guarantees of trustworthiness" inherent with the statement. *Matthews* at 546.

After upholding the continued applicability of *Matthews,* the *Sasso* court analyzed the facts of that case and found that the statements at issue were reliable. The *Sasso* court looked to the following factors: (a) the equal inculpation of the defendant and his co-defendant; (b) the fact that there was no effort to shift blame; (c) the context of when and where the statements were made and whom they were made to; and (d) the fact that there was no attempt

to implicate or curry favor. *Sasso* at 349. After analyzing those factors, the *Sasso* Court found that given the totality of the circumstances as to the content and context of the statements there was "strong indicia of truthfulness" in the co-defendant's statements and concluded that this indicia was sufficient to warrant reliance and admission of the statements against the defendant and that such admission did not violate the defendant's confrontation rights. *Id.* It should be noted that the facts of the case at bar mirror those in *Sasso* and are distinguishable from *Williamson* on similar grounds.

Subsequent to *Sasso*, the Supreme Court, albeit in a plurality decision, again spoke on the issue of the admissibility of statements by a co-defendant in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). Before examining the merits of the *Lilly* decision, it should be noted that the statements at issue in *Lilly* arose in a very different context than the statements in the case at bar. In *Lilly*, the two defendants, who also happened to be brothers, were arrested following a two-day crime spree during which they stole liquor and guns, abducted, and later shot and killed, an individual. During a police interrogation, one brother confessed to stealing the liquor, but claimed that his brother stole the guns and killed the victim. The prosecution attempted to call the declarant as a witness, but the declarant asserted his Fifth Amendment privilege. The trial court, a Virginia local court, then admitted the earlier statement against his co-defendant. In the plurality decision, the Supreme Court held that the co-defendant's hearsay statements were unreliable because of the fact that the statements were made (a) to law enforcement officers, (b) in a police station, (c) while the declarant was in police custody for a serious crime, and (d) in response to police interrogation. *Lilly* at 139, 119 S.Ct. 1887.

The Defendants argue that the Supreme Court's decision in *Lilly* forbids the Government from admitting Salvatore Savoca's statements against Lawrence Savoca on Confrontation Clause grounds, even though such an admission might be within the scope of Rule 804. More particularly, the Defendants contend that *Lilly* stands for the proposition that the Sixth Amendment Confrontation Clause prohibits the receipt of a declaration against penal interest by a non-testifying declarant because a declaration against penal interest neither (1) falls within a firmly rooted hearsay exception or (2) contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability. Defendants' Motion, Page 10 (citing *Lilly* at 124–125, 119 S.Ct. 1887).

The Second Circuit has read *Lilly* much more narrowly than the Defendants suggest. Specifically, the Circuit has "viewed the plurality opinion [in *Lilly* ] as rejecting an accomplice's confession because it was 'largely non-self inculpatory (i.e. the declarant minimized his own criminal responsibility and shifted blame to the defendant).'" *United States v. Dolah*, 245 F.3d 98, 104 (2001) (quoting *U.S. v. Gallego*, 191 F.3d 156, 167, n. 5 (2nd Cir.1999)). Lawrence Savoca's arguments under the holding of *Lilly* would be significantly more persuasive if Salvatore Savoca had tried to assert that Lawrence Savoca had been the primary actor; for example that Lawrence Savoca was the shooter. Instead, the statements in question make it very clear that Salvatore Savoca was the principal actor. If Salvatore Savoca's statements minimize any participant's role, it is his brother's role, not his own. Additionally, unlike *Lilly*, the statements in the current case were not made (a) to law enforcement officers, (b) in a police station, (c) while the declarant was in police custody for a serious crime, or (d) in response to police interrogation.

In *United States v. Bryce*, 208 F.3d 346 (2d Cir.1999), the Second Circuit reaffirmed the viability of the *Matthews* holding post-*Lilly*. In *Bryce*, the defendant objected to the admission of a wiretap tape recording of a conversation involving one of his co-defendants, contending that it violated his rights under the Sixth Amendment's Confrontation Clause. *Id.* at 351. The Second Circuit reiterated its position, after *Lilly*, that the resolution of the question of admissibility is based on an evaluation of the trustworthiness of the statement. *Id.* (citing *Wright*, 497 U.S. at 813–21, 110 S.Ct. 3139 and *Matthews* at 545). In particular, the *Bryce* Court pointed to the following language from *Matthews*:

> Ordinarily, a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption. On the other hand, if the statement is made to a person whom the declarant believes is an ally rather than a law enforcement official, and if the circumstances surrounding the portion of the statement that inculpates the defendant provide no reason to suspect that that inculpatory portion is any less trustworthy than the part of the statement that directly incriminates the declarant, the trustworthiness of the portion that inculpates the defendant may well be sufficiently established that its admission does not violate the Confrontation Clause.

*Id.* (quoting *Matthews* at 545–46 (internal citations and quotation marks omitted)).

With respect to the facts in *Bryce*, the Court found several factors particularly relevant in support of its finding that the statements were admissible over the Confrontation Clause objections. Specifically, the Court relied on the fact that: (i) the statements were obtained via a covert wiretap of which neither of the speakers were aware; (ii) the statements were made during the same time period relevant to the criminal conduct involving Mr. Bryce; (iii) the declarant's statements implicated both himself and Mr. Bryce as participants in a conspiracy; and (iv) the other individual on the phone was a colleague of the declarant in criminal activity. *Id.* Based on those factors, the *Bryce* Court found that the declarant did not have any motivation to lie, and in fact was not lying, and upheld the District Court's decision to admit the statements. *Id.*

In sum, this Court is faced with two lines of case law, the *Williamson/Lilly* [5] line from the Supreme Court and the *Matthews/Sasso/Bryce* line from the Second Circuit. At first glance the two lines appear to be in conflict with one another; however, a more thorough analysis reveals that they address slightly different situations and, when read together, they dovetail neatly. The *Williamson/Lilly* line of cases, which are promoted by the Defendants, discuss scenarios where a declarant gives a statement, confession or allocution to law enforcement officers, or other governmental authority, while in custody following an arrest. On the other hand *Matthews*, and subsequent cases decided in the Second Circuit, analyze the "particularized guarantees of trustworthiness" in the context of a statement made to a girlfriend, or other ally, in a non-coercive, non-custodial setting. There is no question that the facts of this case are much more compara-

---

**5.** Given the fact that they were based on statements that could be deemed "testimonial statements" under *Crawford*, this Court takes no position on the continuing viability of *Williamson* and *Lilly*, post-*Crawford*. However, assuming that *Williamson* and *Lilly* do continue to be binding precedent, this Court finds that they do not preclude admission of the statements in this case.

ble, in fact almost identical, to *Sasso* and *Matthews*.

The Defendant argues that the *Crawford* decision is a dramatic departure from recent jurisprudence; however, a careful reading indicates that *Crawford* clarifies, rather than alters the landscape of Sixth Amendment interpretation. Specifically, prior to the Supreme Court's ·decision in *Crawford* there was a developing, yet unstated, dichotomy of case law between cases where statements were made to law enforcement or judicial authorities and cases where the statements were made to allies or confidantes. This Court referenced this dichotomy above as the *Williamson/Lilly* cases versus the *Matthews/Sasso/Bryce* cases. The *Crawford* decision gives categories—*testimonial statements* and *non-testimonial statements*, respectively—to the two types of situations. In *Crawford*, the Supreme Court re-defined the evaluative procedure for cases that address testimonial statements. However, the opinion did not institute a new evaluation procedure for non-testimonial statements; which remain subject to the *Roberts* "dual inquiry" test. *Matthews*, *Sasso* and *Bryce* involve non-testimonial statements, which were made to allies. Because the *Matthews/Sasso/Bryce* cases fall outside the scope of the *Crawford* holding, this Court finds that those decisions by the Second Circuit are still controlling, even post-*Crawford*.

▮▮▮▮ Having determined that Salvatore Savoca's statements are non-testimonial (and potentially admissible in the absence of confrontation), this Court must review whether those statements have "particularized guarantees of trustworthiness" as required by the Second Circuit and the Supreme Court. This calculation considers many of the same factors discussed above in ascertaining whether the statements are "testimonial" or "non-testimonial" statements. Specifically, this Court looks to the following factors: (1) who did the declarant make the statement to; (2) where was the statement made; (3) was there any coercion in connection with the statement; (4) was the statement offered voluntarily or in response to interrogation; (5) did the declarant make the statement seeking a benefit; (6) did the declarant seek to minimize or maximize his or her culpability; (7) did the declarant attempt to "blame-shift"; (8) when was the statement made; and (9) how detailed was the statement.

In the case at bar, the context and contents of the statements are extremely comparable to the situations in *Matthews*, *Sasso* and, to a lesser extent, *Bryce* and extensively distinguishable from the facts in *Williamson*, *Lilly* and *Crawford*. The declarant, Salvatore Savoca, made the statements to a confidante, Ms. Pocchia—not to law enforcement officials. At the time he made the statements, Ms. Pocchia was his live-in girlfriend and the statements were made while they were in their home—not a police station. There is no coercive element present when one makes a statement to one's girlfriend in one's own home. Further, the statements were made voluntarily by Salvatore Savoca to Ms. Pocchia—not as a result of interrogation by law enforcement authorities. By making the statements to his girlfriend, the declarant was not seeking to obtain any benefit, such as reduced charges or a lesser sentence, or to curry favor with the authorities. Ms. Pocchia was not in a position to offer any of those things.[6] At the time of the statements,

---

**6.** It should be noted that the Government has stated that it intends to call Ms. Pocchia as a witness and the Defendants will have the opportunity to cross-examine her regarding the context of the statement—when, where, what exactly was said· to her, whether she believed Salvatore Savoca, etc.

Salvatore Savoca was not a suspect in Mr. Geary's shooting and did not become a suspect for almost two years. An honest reading of Ms. Pocchia's account of the statements reveals that Salvatore Savoca was not attempting to minimize his role in the incident, but to the contrary, he makes himself the primary bad actor. Almost every portion of Salvatore Savoca's account, as related to Ms. Pocchia, inculpates the declarant.[7] Finally, the context of the statements is significant because they were made in the days immediately following the shooting incident and contain substantial details[8] of the crime, including the motive and a description of the planning and execution of the attempted robbery.

Based upon the totality of the circumstances as to the content, detail and circumstances of Salvatore Savoca's statements, this Court finds that such statements have sufficient particularized guarantees of trustworthiness and may be admitted against Lawrence Savoca at trial.

### 3. Non–Inculpatory Statements:

An additional argument, raised by Lawrence Savoca, is that the statements, while primarily self-inculpating toward Salvatore Savoca, seek to diminish the role of the declarant and to shift the blame to the non-declarant, Lawrence Savoca. Specifically, Lawrence Savoca points to the following statements: (1) Lawrence Savoca threatened Salvatore Savoca into the crime; (2) Lawrence Savoca obtained a gun from a friend and gave it to Salvatore Savoca; and (3) Lawrence Savoca was angry that Salvatore Savoca did not have the

gun and they went back and found it. (Defendants' Motion, Page 2). The Defendants primary argument is that Salvatore Savoca's statements should be precluded, in their entirety, as to Lawrence Savoca. As set forth in greater detail above, this Court disagrees with that argument; however, this Court infers an implicit, alternative argument by Lawrence Savoca, that in the event the statements were held admissible, which they have been, that the non-inculpatory statements should be precluded.

As indicated above, the Supreme Court in *Williamson* cautioned (1) that "the fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability." *Williamson* at 600, 114 S.Ct. 2431; and (2) that each particular assertion in a narrative should be interpreted within the context of the circumstances under which it was made to determine if that assertion is in fact sufficiently against interest. *Williamson* at 603–04, 114 S.Ct. 2431. Based upon the foregoing guidance, the Second Circuit has interpreted *Williamson* as standing for the proposition that the admission of statements by co-defendants "do not offend the Sixth Amendment's Confrontation Clause so long as non-self-inculpatory parts of the statement, particularly parts that are actually self-exculpatory or that name the defendant, are omitted or redacted." *See e.g. Sanin* at \*4 (citing *Williamson* at 600, 114 S.Ct. 2431). However, the *Williamson* decision also held that "statements that give the police sig-

7. As discussed more fully below, there are three entirely non-inculpatory statements, which will be inadmissible at trial.

8. Additionally, it should be noted that the details of the statements (where did gun come from, did attempted robbery/shooting happen

in manner Salvatore Savoca says it did; did Salvatore Savoca and Lawrence Savoca owe $70k to bookmaker, if so who owed what) will be subject to corroboration and contrary evidence, if the same exists, which will make the statements more or less believable to the jury.

nificant details about the crime may also, depending on the situation, be against the declarant's interest." *Williamson* at 603, 114 S.Ct. 2431.

■■ While this Court finds that Salvatore Savoca's statements are, on the whole, self-inculpatory toward the declarant, Salvatore Savoca, there are three particular assertions, which do not inculpate the declarant and therefore lack the indicia of reliability this Court finds necessary. Accordingly, the following statements, as set forth in the account in Section I(C) hereof, shall not be admissible at trial through the testimony of Ms. Pocchia: (1) the third sentence of the account shall be only admissible if the assertion begins "A plan was devised...", rather than "Larry had devised a plan..."; (2) the fourth sentence [9] shall be inadmissible in its entirety; and (3) the first clause of the last sentence, specifically the words "Larry was angry that he did not have the gun with him, and" shall be inadmissible. Lawrence Savoca also seeks to preclude the statement that he procured the weapon that was used to shoot Mr. Geary; however, this Court finds that statement to be a significant detail of the crime, which is strongly against Salvatore Savoca's (the declarant) interest. Therefore, that particular statement is admissible pursuant to *Williamson*.

Subject to the above limitations, all of Salvatore Savoca's statements, which were made to Ms. Pocchia, are inculpatory and will be admissible at trial against both Salvatore Savoca and Lawrence Savoca.

**B.** **Whether the Defendants are entitled to severance and separate trials pursuant to Federal Rule of Criminal Procedure 14:**

Additionally, the Defendants have moved, pursuant to Rule 14 (Prejudicial Joinder) of the Federal Rules of Criminal Procedure, for severance of trial. Severance in federal criminal trials is governed by Federal Rule of Criminal Procedure 14(a), which provides:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief justice requires.

■■ It is well established that Rule 14 is "designed 'to promote economy and efficiency and to avoid a multiplicity of trials, [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial.'" *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), quoting *Bruton v. United States*, 391 U.S. 123, 131, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Zafiro* is the preeminent Supreme Court case on severance and in that decision the Court noted that "there is a preference in the federal system for joint trials of defendants who are indicted together." *Id.* at 537, 113 S.Ct. 933. As a result, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540, 113 S.Ct. 933. Instead, the *Zafiro* Court held that severance should be granted, "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539, 113 S.Ct. 933. In determining the issue of severance, the Second Circuit has closely followed the ruling in *Zafiro,* finding, "severance is justified, not because of antagonistic defenses, but rather where joinder would 'compromise a specific trial right of one of the defendants, or prevent the jury

---

**9.** "Larry had threatened him [Salvatore Savoca] into doing this."

from making a reliable judgment about guilt or innocence.'" *United States v. Haynes,* 16 F.3d 29, 32 (2d Cir.1994) (citing *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933).

■ The Defendants argue that severance is warranted in this case because of the statements made by Salvatore Savoca, which are discussed at length above. This argument was premised on the assumption that this Court would rule that Salvatore Savoca's statements could not be introduced by the Government against Lawrence Savoca. As set forth in great detail above, this Court finds that Salvatore Savoca's statements are admissible against Lawrence Savoca. Therefore, no prejudice will be incurred by the admission of the statements at a joint trial of both Defendants. Accordingly, the Defendants' argument for severance is moot and the Defendants' motion on this issue is denied.

### C. WHETHER THE INDICTMENT FAILS TO ALLEGE THE NECESSARY ELEMENTS OF A HOBBS ACT VIOLATION:

■ Finally, the Defendants challenge whether there is federal jurisdiction to prosecute Counts One and Two of the Indictment. Specifically, the Defendants contend that those Counts of the Indictment fail to allege that the Defendants' conduct affected interstate commerce, which allegation is a requisite element in order to sustain a Hobbs Act violation. Count One of the Indictment alleges a conspiracy to violate the Hobbs Act and Count Two alleges an attempt to commit a Hobbs Act violation, both in violation of 18 U.S.C. § 1951.[10] The language of the first two counts of the Indictment states that "the robbery, had it been completed, *would potentially and probably have,* in any way or degree, obstructed, delayed, and affected commerce[.]" Indictment, ¶ 1

and ¶ 2 (emphasis added). The highlighted language is the point contested by the Defendants.

The Hobbs Act allows for federal prosecution of the typically state law crime of robbery when such a robbery interferes with interstate commerce. Specifically, the Hobbs Act provides, in pertinent part:

whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or *attempts or conspires so to do,* or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added).

■ The Second Circuit has consistently held that only a *de minimus* showing is necessary to establish the interstate nexus required for Hobbs Act jurisdiction. *See e.g. United States v. Fabian,* 312 F.3d 550, 554 (2d Cir.2002) (citing cases). It is the law in this Circuit that "if the defendants' conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or *even potential,* it is sufficient to uphold a prosecution under the Hobbs Act." *United States v. Perrotta,* 313 F.3d 33, 36 (2d Cir.2002) (emphasis added) (quoting *Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991)). Further, the Second Circuit has also upheld Hobbs Act jurisdiction where the jurisdictional nexus is shown by an indirect effect on interstate commerce. *See e.g. United States v. Jamison,* 299 F.3d 114, 120 (2d Cir.2002) (robbery or extortion that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the

**10.** The Indictment consists of four counts. Count Three is a charge for the use of a firearm during a crime of violence under 18

U.S.C. § 924(c)(1)(A)(iii). Count Four is a charge for a felon in possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1).

Hobbs Act); *United States v. Elias*, 285 F.3d 183, 189 (2d Cir.2002) (sufficient to show the robbed grocery store sold goods produced outside of New York State); *United States v. Arena*, 180 F.3d 380, 390 (2d Cir.1999) (a showing of a very slight effect on interstate commerce is sufficient to support Hobbs Act jurisdiction); *United States v. Jones*, 30 F.3d 276, 285 (2d Cir. 1994) (using depletion of assets theory to support jurisdiction in a case where an undercover police officer was robbed of funds because the loss limited the amount of cocaine the officer could purchase in the future, and cocaine travels in interstate commerce).

The Defendants argue that the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) and *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) signal a shift towards a more limited view of federal jurisdiction and that the "effect of interstate commerce" requirement must be narrowly construed. (Defendants' Motion, Page 22–23). However, in three recently decided cases, *United States v. Perrotta*, 313 F.3d 33 (2d Cir.2002), *United States v. Silverio*, 335 F.3d 183 (2d Cir.2003) (per curiam), and *United States v. Angelo*, 87 Fed.Appx. 205 (2d Cir.2004), the Second Circuit interpreted the Hobbs Act in a manner that would sustain a conviction on facts comparable to those in the case at bar.

In *Perrotta*, the Second Circuit held that a robbery victim's employment at a company engaged in interstate commerce was not, by itself, adequate to satisfy the interstate nexus requirement of the Hobbs Act. *Perrotta* at 36. However, the Court went on to articulate several instances where

the robbery of an employee employed at a company engaged in interstate commerce would support Hobbs Act jurisdiction, which include a showing that: (1) the victim directly participated in interstate commerce; (2) the victim was targeted because of his or her status as an employee at a company participating in interstate commerce; (3) the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce; (4) that the crime targeted the assets of a business rather than an individual; or (5) the individual was extorted out of an amount so large, or targeted in connection with so many individuals, that the amount at stake cumulatively had some effect on interstate commerce. *Perrotta* at 37–38 (citations omitted).

Second, in *Silverio*, a case with facts very similar to the case at bar, the Second Circuit affirmed a Hobbs Act conviction of three defendants who attempted to rob the apartment of a doctor, who they believed kept a large amount of cash from his medical practice at his home.[11] *Silverio* at 185–87. The Circuit Court stated that when "viewed in the light most favorable to the Government, [there] was sufficient evidence to demonstrate an interstate nexus." *Id.* at 187–88. The Court in that case relied upon the fact that the doctor/potential victim "was a direct participant in interstate commerce through his business of treating a worldwide celebrity clientele … and because the robbery targeted the assets of his business rather than his personal property." *Id.* In the case at bar, while Mr. Geary may not have been "treating a worldwide celebrity clientele," he certainly was serving his respective "clientele" beverages from around the world.[12]

---

**11.** The defendants in that case broke into the wrong apartment and stole $300 and two ATM cards from a different victim, but the Court held that the Hobbs Act requirement was satisfied because the focus should be on

the defendant's belief about the nature of the action. *Silverio* at 185.

**12.** The Defendants have not alleged that the Rhino Bar was only selling alcohol made in New York from ingredients grown/manufac-

Third, in *Angelo,* the Second Circuit held that the nexus to interstate commerce was satisfied when the defendants attempted to rob the "coin girl" at a laundromat, when it was shown that the owner of the laundromat made regular payments for some of his laundry machines to an out-of-state supplier. In that case, the Court held that "[a]lthough slim, on our precedents, these facts are sufficient, under a depletion of assets theory, to authorize an attempted robbery prosecution under the Hobbs Act." *Angelo* at 207.

Applying the reasoning from the *Perrotta, Silverio* and *Angelo* decisions to the case at bar, four of the five *Perrotta* factors are satisfied, which support the finding of an interstate nexus and establishes Hobbs Act jurisdiction. First, Mr. Geary, as the owner and operator of the Rhino Bar, directly participated in interstate commerce by buying alcohol and other products. Second, the Government's theory of the case is that Mr. Geary was targeted because he carried the cash receipts from his business, the Rhino Bar, home every night. Third, the robbery of Mr. Geary, if it had been completed, would have depleted the assets of the Rhino Bar; not necessarily Mr. Geary personally. Fourth, the assets targeted by the Defendants were assets of the Rhino Bar, specifically, the assets were the cash receipts from that night's business; not Mr. Geary's personal assets.

This Court finds that the Government's alleged facts regarding the attempted robbery are sufficient to demonstrate an interstate nexus because Mr. Geary was a direct participant in interstate commerce through his operation of the Rhino Bar, the robbery would have depleted the assets of the Rhino Bar, and the robbery targeted the assets of the Rhino Bar rath-

er than his personal property. This Court finds the language of the Indictment sufficient to support criminal charges under the Hobbs Act. To adopt the Defendants' position would be akin to a finding that inchoate crimes such as conspiracy and attempt could not be prosecuted under the Hobbs Act. The language of the statute directly refutes this position; it specifically includes conduct where one "attempts or conspires." Accordingly, the Defendants' motion to dismiss Counts One and Two of the Indictment is denied.

### III. CONCLUSION:

For all of the foregoing reasons, this Court finds:

A. The statements made by Salvatore Savoca are admissible, subject to the limitations set forth in Section II(A)(3) hereof, against both Salvatore Savoca and Lawrence Savoca and the Defendants' Motion to exclude such statements as to Lawrence Savoca is denied.

B. The Defendants' Motion for severance and separate trials pursuant to Fed.R.Crim.P. 14 is denied.

C. The Defendants' Motion to dismiss Counts One and Two of the Indictment is denied.

It is so ordered.

---

tured in New York and bottled in New York in bottles, which were made in New York from

products made in New York, etc.